Farish v. Cook.

---

FARISH, *Plaintiff in Error,* v. COOK.

1. **Statute of Limitations:** CUMULATION OF DISABILITIES. The period of coverture cannot be added to that of minority of the same person in order to prevent the running of the statute of limitations.

2. **A Will Construed:** "ALL MY WORLDLY GOODS." A will ran thus: "I give and bequeath to my beloved wife all my worldly goods,

consisting of household furniture, clothing, beds and bedding, money and cattle, also whatever debts may be due me, likewise my house and lot, * * to be by her enjoyed during her life, and at her death to belong to the child with which she is now pregnant, if it should survive her, if not, then the said house and lot to be vested absolutely in her." In addition to the house and lot, the testator, both at the time of making the will and at his death, owned other real estate. *Held*, that it could not pass by the designation " all my worldly goods," and as it was not specifically mentioned or otherwise referred to, as to it the testator died intestate.

3. Wills: PRESUMPTION AGAINST INTESTACY. It is a natural presumption that a testator, in making his will, intended to dispose of his whole estate and not to die intestate as to any part of it, and in construing doubtful expressions this presumption ought to have weight, but it cannot supply the actual intent of the testator to be derived from the language of the will. When the clause to be construed cannot be connected with some other part of the will disclosing such intent, it cannot prevail, nor even where the intent is disclosed, in the absence of language sufficient to carry everything.

*Error to St. Louis Court of Appeals.*—Reported in 6 Mo. App. 328.

AFFIRMED.

*Henry W. Williams* and *E. T. Farish* for plaintiff in error.

*Krum & Krum* and *Glover & Shepley* for defendant in error.

MARTIN, C.—This was an action of ejectment, commenced on the 26th day of February, 1875, in the circuit court of the city of St. Louis, to recover possession of a tract of land in the Grand Prairie Common Fields, two arpens in width by forty in depth. The defendant denied the plaintiff's right of possession, and pleaded the defense of the statute of limitations, relying upon an actual, uninterrupted and exclusive adverse possession for more than forty years before commencement of the suit. The case was tried by the court, and a great deal of evidence peculiar to this class of cases, was submitted by both sides. The

merits of the case seem to have been disposed of in certain rulings on the evidence, as the case proceeded. At the conclusion of the evidence, the defendant asked and the court gave the following instruction:

If the court finds from the evidence that the defendant took actual possession of the land in controversy in this suit as early as the year 1848, and that he has had actual, continuous and uninterrupted possession of the same ever since, and down to the commencement of this suit, under claim and color of title adverse to the plaintiff, and those under whom he claims, then the plaintiff cannot recover in this action.

After this action of the court the issues were found for the defendant, and judgment rendered in his favor. The plaintiff appealed to the St. Louis court of appeals, and the judgment was affirmed. 6 Mo. App. 328.

The evidence in the record tended very strongly to prove that the defendant, and those under whom he claimed title, had been in the uninterrupted and peaceful possession of the land under color of title from 1845, a period of thirty years. This ought to be a good defense against any title, unless some of those disabilities indicated in the statute, such as minority and coverture, have occurred to arrest the effect of its beneficent provisions. The plaintiff claims that the owners of the title asserted in this case were under the disability of coverture a sufficient length of time to deprive defendant of his full bar of the statute which he otherwise would have. It becomes necessary to examine this important and decisive question, which seems to have disposed of the case in both of the lower courts. If the defendant is right in this defense, nothing can be gained by considering the difficult questions relating to the location of the Spanish grants given in evidence, which have been discussed with so much learning and ability by the counsel for both sides.

The plaintiff's chain of title commenced December 30, 1766, with a Spanish concession of that date, of two arpens front by forty in depth, in the Grand Prairie, to

John Baptiste Hervieux. This original grantee died on the 6th day of November, 1775, and on the 7th day of January, 1776, at the judicial sale of Hervieux's estate, under an order of the lieutenant-governor of Illinois, Louis Honore became the purchaser of this concession. Louis Honore died on the 26th day of April, 1807, leaving as his sole heir Louis Tesson Honore, his son. On the 2nd day of February, 1816, Recorder Bates, under the provisions of the acts of congress of June 13th, 1812, and March 3rd, 1813, reported this concession to congress for confirmation, and it was confirmed in pursuance of the act of congress of April 29th, 1816, to John Bte. Hervieux's legal representatives. This confirmation enured to Louis Tesson Honore, owner of the title at that time. Louis Tesson Honore died on the 21st day of August, 1827, leaving a widow, by name Amaranthe, and a child named Maria, who was born August 14th, 1827, seven days before his death. He also left a will which he had made on the 7th day of August, 1827, two weeks before his death; which was admitted to probate on the 1st day of October, 1827, in which, it is claimed by plaintiff, he intended his widow should be his devisee as to this land. His widow married Louis Leduc on the 30th day of January, 1832, and died November 24th, 1864, under the coverture of this marriage. His daughter Maria married William Booth on the 26th day of April, 1848, and during the coverture of this marriage deeded the land to the plaintiff on the 3rd day of August, 1874, in consideration of the sum of $5.

It is obvious from this statement relating to the title that it became an important matter to the plaintiff, in meet-

1. STATUTE OF LIMITATIONS: cumulation of disabilities. ing the defense of the statute of limitations, as to which one of the two methods of devolution afforded him the best right of action in 1875, when he filed his petition. If he derived his title from Mrs. Booth, as the only child and heir of Louis Tesson Honore, then the title descended to her subject to her mother's dower at the date of her father's death, August

21st, 1827. Her minority would arrest the running of the statute of limitation until the 14th day of August, 1848, at which time she attained her majority. But her coverture, which commenced April 26th, 1848, a few months only before the expiration of her minority, and continued till she made her deed to plaintiff in 1874, could not be added to her disability of minority for the purpose of continuing her exemption from the bar of the statute; provided the adverse possession of the defendant commenced under her first disability of minority. Now, it is in evidence, as heretofore stated, that the adverse holding of defendant and his grantors did commence in 1845, which was about three years prior to her majority. The deduction of three years on account of her minority would leave an adverse holding of twenty-seven years, upon which judgment would have to go for defendant.

If the plaintiff could successfully derive title from Mrs. Booth, as inheriting it from her mother as the devisee of the father, then the defense of the statute would be overcome, because she would not have inherited it till the death of her mother on the 24th day of November, 1864, and the coverture of her mother with Louis Leduc from January 31st, 1832, would arrest the operation of the statute as against the adverse possession of defendant commencing in 1845, and pass the title to Mrs. Booth on the 24th day of November, 1864, unimpaired by its effects. The coverture of Mrs. Booth existing at that date, and continuing till her conveyance to plaintiff in 1874, would arrest the operation of the statute till that date, and leave the defendant with an adverse possession within the statute, of about one year instead of twenty-seven. The coverture of the mother and the succeeding coverture of the daughter would not constitute a cumulation of disabilities, because they appertain to different parties.

It is proper for me to remark here, that I am stating the position which the plaintiff takes in order to meet the defense of the statute of limitations, and that I have no

occasion to consider whether the bar of twenty-four years in the act of 1847, is affected by coverture or minority. *Valle v. Obenhouse*, 62 Mo. 81.

The controversy is thus narrowed down to the single question as to whether Louis Tesson Honore devised this land to Amaranthe, his widow, or died as to it intestate, thus casting the descent at once upon his daughter, who afterward married William Booth, and conveyed it to the plaintiff. The determination of this question depends upon the construction of the will of Honore. The only clause by which anything was devised in the will is as follows: " Secondly, I give and bequeath to my beloved wife, Amaranthe Honore, all my worldly goods, consisting of household furniture, clothing, beds and bedding, money and cattle; also whatever debts may be due me; likewise my house and lot I now occupy in the city of St. Louis, to be by her enjoyed during her life, and at her death to belong to the child with which she is pregnant, if it should survive her, if not, then said house and lot to be vested absolutely in my said wife, to be by her disposed of as she may think proper." This is an authentic translation of the will which was written in French. If this land was devised by the will, then it must have been included in the words " all my worldly goods."

> 2. A WILL CONSTRUED: "all my worldly goods."

While it is true that the intention of the testator must govern the construction of his will, it is equally true that this intention must he obtained from the words of the instrument as applied to the subject matter and the surrounding circumstances. The intention must come from what he says in his will. If this is apparent from the words as applied to the subject matter it should be accepted and followed by the courts, unless it contravenes the law or leads to absurd conclusions. When such results are threatened, the action of the court is governed by rules which need not be considered in this case. Did the testator, by using the term "all my worldly goods," intend to devise this land to his wife?

One of the rules of construction adopted by Jarman, and accepted in England and America, is, "that words in general are to be taken in their ordinary and grammatical sense, unless a clear intention to use them in another, can be collected, and that other can be ascertained, and they are in all cases to receive a construction which will give to every word some effect, rather than one that will render any of the expressions inoperative; and of two modes of construction, that is to be preferred which will prevent a total intestacy." 2 Jarman on Wills, 762. The wisdom of this rule is more strongly recognized the more it is applied. In the case of *Grey v. Pearson*, 6 H. L. C. 61, Lord Wensleydale remarks : "I have been long and deeply impressed with the wisdom of the rule, now I believe universally adopted, at least in the courts of law in Westminster Hall, that in construing wills, and indeed statutes and all written instruments, the grammatical and ordinary sense of the words is to be adhered to unless that would lead to some absurdity or some repugnance or inconsistency with the rest of the instrument, in which case the grammatical and ordinary sense of the words may be modified so as to avoid the absurdity and inconsistency, but no further." In *Young v. Robertson*, 4 Macq. H. L. C. 314, (2 Scotch App., Paterson 1108,) the court says : "The primary duty of a court of construction in the interpretation of wills, is to give to each word employed, if it can with propriety receive it, the natural ordinary meaning which it has in the vocabulary of ordinary life, and not to give to words employed in that vocabulary an artificial, a secondary and a technical meaning." Judge Strong, in *Christie v. Phyfe*, 19 N. Y. 344, decided in 1859, says : "The language used shall receive its ordinary interpretation, except where some other is necessary or clearly indicated." In determining what is the natural and ordinary sense of the words used in a will, adjudicated cases can render no valuable assistance. They are too apt to mislead or bias the mind.

According to its natural grammatical and ordinary

meaning, the word "goods" does not include lands. It includes only personal property. General usage has given it this meaning. This is its primary signification. If it possesses any other meaning in this will it ,must appear from the context. Of course, if the testator had declared in his will that by the use of the term "goods" he intended to include real estate, that intent so declared in the will, would control the ordinary meaning of the word. So, if in the absence of any express declaration, it appears from the context of the will, that he intended to use the word in a different and more comprehensive meaning, so as to embrace real estate, the courts would give effect to that intent. But I am unable to discover anything in the context of this will to indicate that the word was used with such a meaning. In prefixing it with the words " all my worldly," he makes use of a phrase, which if used alone with the word "goods," might be reasonably supposed to embrace his lands; and this meaning of the phrase has in some instances been sustained. But the subsequent language indicates by its enumeration, that he did not intend it should include real estate, for he continued, " consisting of household furniture, clothing, beds and bedding, money and cattle." He wills her his worldly goods, and tells what they are, thus restricting the meaning to personal property. He next wills the debts due him, which as rights of action do not ordinarily fall under the designation of " goods." He next proceeds to dispose of his real estate, making special mention of it, which naturally excludes that kind of property from the operation of the language, which he had restricted to certain personal property. If he had other real estate in his mind at the time, he would naturally have mentioned it, when making specific devises of such property.

If the term " all my worldly goods " in the first part of the will is to be construed as including real estate unmentioned, then the clause relating to the real estate mentioned, will have to be construed as an exception to the devising intent of that clause, because it gives only a life

estate to the devisee in respect to the house and lot so mentioned. This construction cannot be accepted, for the reason that the language relating to the house and lot has neither the force nor purport of an exception.

This theory of interpretation is not urged by the plaintiff. But in maintaining that the term "worldly goods" includes the real estate in suit, he admits and contends that only a life estate was given to the widow in the goods, chattels, money and rights of action, as well as the real estate mentioned; and following out this interpretation to its proper conclusion, he insists that the will should be construed as if it read as follows: "I give and bequeath to my beloved wife, Amaranthe Honore, all my worldly goods, to be by her enjoyed during her life, and at her death to belong to the child with which she is now pregnant, if it should survive her. My worldly goods consist of household furniture, clothing, beds and bedding, money and cattle, also debts due to me, likewise a house and lot, which I now occupy, in the city of St. Louis. If the unborn child does not survive its mother, then the said house and lot is to be vested absolutely in my wife, to be disposed of as she may think proper." But the language of the instrument will not admit of this transposition, for the simple reason that the life estate by the express language used is confined to the house and lot. The house and lot were "to be by her enjoyed during her life," and in the event of her surviving the child, then the "house and lot" were to be hers absolutely. To extend this limitation to the personal property mentioned and the real estate unmentioned, would be equivalent to making a will for the testator, instead of accepting the one he left.

It is urged by plaintiff that another interpretation would be in violation of the rule that a testator, in making 3. WILLS: presumption against intestacy. a will, is presumed to intend the disposition of his whole estate, and not to die intestate as to any part of it. This is a natural presumption which ought to have weight in construing doubtful phrases.

*Ibbetson v. Beckwith,* Talbot's Cases 161 ; *Winchester v. Foster,* 3 Cush. 366. But no implication of this kind can supply the actual intent of the testator to be derived from the clauses of the will. The rule has generally been applied in the construction of the subsequent clauses of a will, when the first or prefatory clause disclosed the actual intent to devise everything. *Gaines v. Fender,* 57 Mo. 342. In *Leake v. Robinson,* 2 Mer. 385, Sir William Grant, Master of the Rolls, remarks : " There is certainly a strong disposition in the courts to construe a residuary clause so as to prevent an intestacy with regard to any part of the testator's property." But when the clause to be construed cannot be connected with some other part of the will disclosing that intent, there seems to be no good authority for application of the rule. *Denn v. Gaskin,* Cowp. 657 ; *Right v. Sidebotham,* 2 Doug. 759; *Smith v. Hutchinson,* 61 Mo. 83 ; *Bowlin v. Furman,* 34 Mo. 39. And even when the actual purpose to devise everything is indicated, it cannot prevail in the absence of language sufficient to carry everything.

It is possible that the testator thought that he had devised everything he possessed. His language does not include the outlying claim in the Grand Prairie, and there is no evidence from the will or otherwise, that he had it in mind at the time of making his will. It had cost his father only thirty-three livres payable in doeskins, which would be about $6.60, and the value of it was probably not sufficient to make it such an important matter, if he should die intestate with respect to it.

Upon the whole it seems to me that the testator did not intend to devise his lands under the term " goods ;" that a plain and natural meaning is given to every other part of the will without including the recognition of such an intent, and that too without leading to anything like total intestacy; and that such an intent cannot be evoked from the context of the will, without ignoring its obvious import and meaning. I concur entirely with the court of

appeals in its interpretation of this will, and think its judgment should be affirmed. Accordingly it is so ordered. PHILIPS, C., concurs; WINSLOW, C., absent.