266 P.2d 377 (1953)
IN RE VAN VOAST'S ESTATE
GOSS et al.
v.
STAPLES et al.
No. 9230.
Supreme Court of Montana.
Decided November 6, 1953.
Rehearing Denied February 17, 1954.
Sias and O'Donnell, Chinook, Betty Ann Scott, Great Falls, Charles L. O'Donnell, Chinook, for appellants.
Hall, Alexander and Burton, Great Falls, for appellants on Petition for Rehearing only.
Burns and Thomas, Harry L. Burns, Chinook, for respondents.
FREEBOURN, Justice.
This action comes to us on appeal. The question presented to us is whether or not a letter from the decedent to a stepchild is a holographic will. Two district judges found the letter to be such a will. Under the will the disposition of the property goes to residents of Montana who are stepchildren of the deceased.
The questioned instrument is a letter of seven pages, dated November 29, 1945, signed by the maker, and entirely in her own handwriting. It contained in part the following language: "There is something else I want you, George, and the family to know and that is that should I pass out, *378 (which I surely will sometime) well whenever that happens if I leave any worldly goods worth possessing I should want it divided equally among you five children. I have a few bonds on which I have placed the names of my nephews and nieces as beneficiaries  and I had once thought of making a will to leave whatever else I have to the Van Voast grand-children, but that did not seem to me to be fair to Edith and Audra who have no children. I do not know whether or not I should make a will, or just how to make it as things now stand. In any event I have all arrangements made with Comstocks here to take charge if I should be stricken, while here alone, with no one to look after such things, and there is a contract to that effect in my safety box in the bank.
"I am expecting with reasonable confidence to be here for at least a few more years, but one can never tell, you know, just what is coming up, and I see no reason for putting everything off for some one else to attend to at the last minute. I have also had a marker for myself placed in the Walton lot in the cemetery here, beside my sister, who was my mother for twenty-nine years.
"Hoping you are all well and that your winter is not too cold I will sign off and go look for something to eat.
 "Yours with love, Cora."
R.C.M. 1947, sec. 91-108, provides: "A holographic will is one that is entirely written, dated, and signed by the hand of the testator himself. It is subject to no other form, and may be made in or out of this state, and need not be witnessed."
Since the letter was written, dated and signed entirely in the handwriting of the testator, it was upon its face a valid holographic will, so far as its form was concerned. In re Noyes' Estate, 40 Mont. 190, 201, 105 Pac. 1017, 26 L.R.A., N.S., 1145.
If, then, such letter shows, when read in connection with surrounding facts and circumstances, a testamentary intention, it is a valid, holographic will. In re Noyes' Estate, 40 Mont. 231, 106 Pac. 355.
"There is no definite fixed rule by which testamentary intent may be gauged. * * * All of the courts lay down the rule that the determination of the testamentary intent is to be made from the writing itself, and most states hold that the surrounding circumstances may be considered, Montana being one of the latter." In re Augestad's Estate, 111 Mont. 138, 106 Pac. (2d) 1087, 1088.
No particular words are necessary to show a testamentary intent. It must appear only that the maker intended by it to dispose of property after the maker's death. In re Button's Estate, 209 Cal. 325, 287 Pac. 964; Mitchell v. Donohue, 100 Cal. 202, 34 Pac. 614, 38 Am. St. Rep. 279; In re Estate of Spitzer, 196 Cal. 301, 237 Pac. 739. See, In re Irvine's Estate, 114 Mont. 577, 139 Pac. (2d) 489, 147 A.L.R. 882.
In Langfitt v. Langfitt, 108 W. Va. 466, 151 S.E. 715, 716, the West Virginia Supreme Court said: "The letter is not testamentary in form, but we are of opinion that the phrase `if I should fail to pull through this operation, I want you to sell,' etc., denotes testamentary intent. In England, as early as 1755, a letter containing the informal phrase, `if any misfortune should happen to me' was held to be `clearly testamentary.' See Repington v. Holland, 2 Lee, 106, 161 E.R. 280. A number of American decisions in which like expressions have been held to indicate testamentary intent are collected in Re Tinsley's Will, 187 Iowa 23, 32, 33, 174 N.W. 4, 7, 11 A.L.R. 826. * * *
"Long before the Revolution it was not considered necessary in England that the testator should intend to execute or realize that he had executed a will. See 28 Halsbury (the Laws of England) p. 546, sec. 1079, and cases cited in note (p); 1 Lomax on Ex'rs, p. 34, sec. 2. The Virginia court, following the English decisions, held in 1846, `Nor is it necessary that the testator should intend to perform, or be aware that he has performed, a testamentary act.' Pollock v. Glassell, 2 Grat., [Va.] 439, 455. * * *
"Animus testandi is not the purpose to make a will but to direct the posthumous disposition of property. `The animus testandi * * * consists of an intention * * * to make some positive disposition of property * * * to take effect in no *379 way until the testator's death.' Gardner on Wills, p. 15, sec. 4; In re Johnson's Will, 181 N.C. 303, 305, 106 S.E. 841, 842. `The essence of a testamentary disposition of property is that it be merely a declaration of the testator's intention as to what shall take place after his death.' Eaton v. Blood, 201 Iowa 834, 839, 208 N.W. 508, 511, 44 A.L.R. 1516; Pollock v. Glassell, supra; Roberts v. Coleman, supra [37 W. Va. 143, 16 S.E. 482]; Lauck v. Logan, supra [45 W. Va. 251, 31 S.E. 986]; Harrison, supra [1 Harrison on Wills], sec. 102(3); Schouler, supra [1 Schouler on Wills, Ex'rs and Adm'rs, 5th Ed.], sec. 274; 1 Jarman on Wills (6th Ed.) 33; 40 Cyc. p. 1084, sec. 11; 28 R.C.L. 110."
In Warnken v. Warnken, Tex. Civ. App., 104 S.W. (2d) 935, 937, the Texas Court said:
"* * * In holographic instruments neither the form of the document nor the words used by the writer are of controlling importance if its genuineness is certain, and the intention of the maker is clear. * * * Nor does the fact that a testator does not realize that he is making a will and does not so consider the instrument so executed, deprive such instrument of testamentary character or prevent its probate, if in fact and in law it constitutes a testamentary disposition of his property. Adams v. Maris, supra [Tex. Com. App., 213 S.W. 622]; Barnes v. Horne (Tex. Civ. App.), 233 S.W. 859; Merrill v. Boal, 47 R.I. 274, 132 A. 721, 45 A.L.R. 830; 44 Tex. Jur., sec. 111, p. 655."
The rule, which appeals to us as common sense, by which the character of such an instrument as Cora Van Voast's letter is to be determined, is set out in Nichols v. Emery, 109 Cal. 323, 329, 41 Pac. 1089, 1091, wherein it is said: "It is undoubtedly the general rule enunciated by the leading case of Habergham v. Vincent, 2 Ves. Jr. 231, and oft repeated, that the true test of the character of an instrument is not the testator's realization that it is a will, but his intention to create a revocable disposition of his property, to accrue and take effect only upon his death, and passing no present interest."
Cora G. Van Voast, who died on December 7, 1949, at Unionville, Missouri, left no will, other than the proposed holographic will, the letter dated November 29, 1945. So that, in determining whether such letter is a valid holographic will, we must bear in mind that "of two modes of interpreting a will, that is to be preferred which will prevent a total intestacy." R.C.M. 1947, sec. 91-210. See In re Irvine's Estate, supra.
The evidence shows that H.R. Van Voast, father of six children, died in 1938, leaving as part of his estate the land which passes to five of his children, respondents here, if the letter, under discussion here, is held to be a valid holographic will. Such land is "seven hundred twenty acres, and I should judge about two hundred is farm land," located near Turner, Montana.
H.R. Van Voast and his wife, Cora, were married on February 2, 1909, in Missouri. They moved to Montana in 1913. By such marriage Cora became the step-mother of Van Voast's six children, ranging in age from 8 years to 20 years. One of these children, Zelma, died in 1940. Over the years the relations between Cora and her stepchildren were those as ordinarily exist between a mother and her own children. It was testified:
"Q. Would you say that it was the same relationship that ordinarily existed between a natural son and his own mother? A. Well, of course, she was the only mother I ever knew.
"Q. And that's the way you felt toward each other? A. Sure."
Cora, who returned to Missouri in 1943, came to Montana to care for Zelma in her last illness, at Culbertson, Montana. The respondents and their stepmother corresponded regularly and the respondents, or some of them, visited her each year.
Cora Van Voast acquired the land by a "settlement of my father's estate. He left no will, so we decided that it would be best to give her the largest unit of the estate, and she was automatically retired on that * * * Q. That was the mutual agreement of the heirs? A. Yes, sir."
*380 In July 1946, Cora said to one of the respondents, while he was visiting her in Missouri, "If there's anything left I am going to return it to the Van Voast children. * * * if there is anything left I am returning it to you children."
It would seem from the letter, admitted as a holographic will, that Cora Van Voast was, when she wrote it, in poor physical condition, for she writes: "I am more or less staggery and uncertain of equilibrium * * * I am about to lose my courage. * * * Yes, he [her dog] it was who caused my accident * * * he made a lunge * * * throwing me off balance and I pitched to the ground with my arms flung forward and hands pointed right into the ground. * * * What makes me anxious now is the weakness I have in my back and limbs. * * * I do not think of walking * * * without my cane because I am afraid of falling and afraid I might get so I couldn't walk." She apparently wanted advice from George Van Voast, to whom the letter was written, for she wrote: "Well, I suppose you may be wondering why I am taking up your valuable time with all this. Well I'll tell you it is because I want some [one] to know that old age is creeping up and if I am not in as good condition as I should be I want some one to know about it and maybe give me some advice about what to do."
It is our judgment, as it must have been the judgment of the learned district judges, that the use of the closing words of decedent's letter supplies the intent that she then and there foreclosed her affairs and was willing to rest upon the wishes expressed in her letter: "I am expecting with reasonable confidence to be here for at least a few more years, but one can never tell, you know, just what is coming up, and I see no reason for putting everything off for someone else to attend to at the last minute. I have also had a marker for myself placed in the Walton lot in the cemetery here, beside my sister, who was my mother for twenty-nine years." Emphasis supplied.
It may be alluded to that her letter sought suggestions, and if any may come she would change her wishes. The record discloses no action was further taken by the deceased regarding her estate, either upon suggestion or otherwise.
One cannot read the letter without feeling that she was thinking of approaching, and perhaps sudden, death, and in a state of mind under which many wills are made. The letter clearly indicates she intended upon her death that her "worldly goods" should go to the five Van Voast children. Although the letter was written in 1945 and she died in 1949, Cora did not, during those four years, make any other will. Taking the letter, the circumstances surrounding it, and the law, into consideration, one may conclude, with reason, that the two district judges, judges of years of experience and of recognized ability, were correct in holding that the letter, written by Cora G. Van Voast, was a valid, holographic will, made with testamentary intent.
The evidence was sufficient to justify the findings of fact, conclusions of law, and the judgment made and entered by the district court. For the foregoing reasons the judgment of the lower court is affirmed.
BOTTOMLY and ANDERSON, JJ., concur.
ADAIR, Chief Justice (dissenting).
I dissent.
The writing before us is merely a social letter. It is replete with information as to the writer's situation and physical condition. It asks advice as to "whether or not I should make a will." If the advice be that she should make a will then she desires to know "just how to make it as things now stand."
Clearly in writing her letter the writer did not consider that she was then writing a will nor did she ever contemplate that at some future day her informal friendly letter would be filed in the county courthouse and there be probated as and for her last will and testament by virtue whereof her heirs at law should inherit no part of her real property located in Montana.
*381 On December 9, 1949, Cora Goss Van Voast, an elderly widow, died at Unionville in the State of Missouri leaving estate, both real and personal. Some of her property is situate in the State of Missouri and the remainder in the State of Montana.
At the time of her death and continuously for a number of years immediately prior thereto the decedent was a bona fide resident of and actually domiciled in the State of Missouri, living in a home which she maintained at Unionville, Missouri.
The decedent left no formal attested will nor did she leave any writing entitled to be admitted to probate as a will under the laws of the State of Missouri.
Decedent left no surviving issue, husband, lineal descendant, father, mother, brother, nor sister. Decedent's only heirs are the appellants herein they being decedent's nephews, nieces, grandnephews, and grandnieces. Read R.C.M. 1947, sec. 91-403, subd. 4.
The respondents other than Lee Staples are the surviving issue of one H.R. Van Voast by his first wife.
In 1909 and following the death of his first wife who was the mother of all his issue, H.R. Van Voast took unto himself as his second wife the aforementioned Cora Goss whom he married at Unionville, Missouri.
In the fall of 1938 H.R. Van Voast died leaving considerable estate but no will.
Upon the death of H.R. Van Voast intestate all of his property immediately passed under the law to his heirs they being his surviving wife, Cora Goss Van Voast, and the six issue born of H.R. Van Voast's first marriage, namely, his sons, Jess, George and Milo and his three married daughters namely, Mary Audra Van Voast Staples, Edith Van Voast Owens and Zelma Van Voast Bonebright.
On February 18, 1950, the respondents who, other than the administrator Lee Staples, are the surviving issue of H.R. Van Voast's first marriage, caused to be filed in the district court of Blaine County, Montana, a certain informal informative longhand letter bearing, in figures, the date "11-29-1945" claiming that such letter was entirely written, dated and signed by the hand of the decedent, Cora Goss Van Voast, at her home in Unionville, Missouri, and by her addressed and mailed to the respondent George Van Voast at his home at Geraldine, Montana, where it was received by George Van Voast shortly after the date it bears.
By an order entered May 11, 1950, the district court of Blaine County admitted the script letter of "11-29-1945" to probate and appointed the respondent Lee Staples administrator with the will annexed of Cora Van Voast's estate in Montana.
Thereafter the appellants, as heirs of the decedent Cora Goss Van Voast, petitioned for an order to set aside the court's above order of May 11, 1950, and this is an appeal from a subsequent order denying appellants all relief,  dismissing their petition and confirming in all respects the court's earlier order of May 11, 1950.
Does decedent's Montana property pass to the respondents under the script letter of "11-29-1945" or does it go to the appellant heirs under the Montana statute, R.C.M. 1947, sec. 91-403, subd. 4?
There is no natural right to receive property by will or inheritance. State ex rel. Bankers' Trust Co. v. Walker, 70 Mont. 484, 494, 226 Pac. 894.
The right to make testamentary disposition of property depends entirely upon the will of the legislature. It may withhold or grant the right, and, if it grants it, it may make its exercise subject to such regulations and requirements as it pleases. It may declare the rules which must be observed, touching the execution and authentication of the instruments necessary to indicate the testator's intention and make a compliance with them mandatory. In re Noyes' Estate, 40 Mont. 178, 185, 105 Pac. 1013; In re Hauge's Estate, 92 Mont. 36, 39, 9 Pac. (2d) 1065.
The whole matter of the disposition of estates of decedents is within the legislative control.
The right to inherit, resting as it does upon public policy, is dependent entirely upon the will of the legislature, except as its power is restricted by constitutional provision. *382 In re Colbert's Estate, 44 Mont. 259, 266, 119 Pac. 791.
In Montana every person over the age of eighteen years, of sound mind, may, by last will, dispose of all his estate, real and personal. R.C.M. 1947, sec. 91-101.
"The property, both real and personal, of one who dies without disposing of it by will, passes to the heirs of the intestate, subject to the control of the district court, and to the possession of any administrator appointed by that court for the purposes of administration." R.C.M. 1947, sec. 91-402.
It is well settled that rights vest under our statutes immediately upon the death of either a testator or an intestate. In re Nossen's Estate, 118 Mont. 40, 43, 162 Pac. (2d) 216; Miller v. Murphy, 119 Mont. 393, 398, 175 Pac. (2d) 182.
Missouri Administration. Decedent's informal unattested script letter hereinafter set forth does not constitute a valid will in Missouri. It could not have been admitted to probate in that state for the simple reason that the laws of Missouri do not recognize holographic wills in any form or manner. Such being the law in Missouri, the decedent died intestate as to all her estate, real and personal, having its situs in that state and the courts thereof appointed an administrator who is now engaged in administering all of decedent's property having its situs in Missouri.
Montana Administration. Unlike the statutes of Missouri, those of Montana recognize the validity of unattested script writings of a testamentary character which have been executed with testamentary intent and which otherwise meet the requirements of the Codes and statutes of Montana. R.C.M. 1947, sec. 91-108.
As before stated, under the laws of Montana, the property, both real and personal, of one who dies without disposing of it by will, passes immediately to the heirs of the intestate, R.C.M. 1947, sec. 91-402, which, in the instant case, means that if Cora Goss Van Voast died without disposing of such of her estate as is situate in Montana, then such estate is succeeded to, R.C.M. 1947, sec. 91-101, by appellants as decedent's heirs and next of kin pursuant to the express provisions of R.C.M. 1947, sec. 91-403, subd. 4.
Respondents urge that as to all her estate having its situs in Montana, the decedent Cora Goss Van Voast died testate and that title to such property passes to respondents under the script letter of "11-29-1945" and that no title passed to the appellant heirs of the decedent under the provisions of the Montana statute, R.C.M. 1947, sec. 91-403.
"The courts have said again and again that the test whether or not an instrument is testamentary in character is whether it was executed with the animus testandi; with testamentary intent." 1 Page on Wills, 3d Ed., sec. 46, p. 101.
The cardinal rule in the construction of a writing claimed to be of testamentary character is to find the decedent's intent.
In arriving at the present intention of the writer the court should consider the contents of the entire letter from its four corners rather than from isolated portions thereof.
Script Letter. The entire script letter reads:
 "Unionville, Mo.
 11-29-1945
"Dear George & Family:
"I am wondering if Max ever got home or is he still in Belgium? It is quite a satisfaction to know he has survived and can come home sometime soon.
"I guess Geo.'s letter to me crossed the one I wrote to him in the mail. I did not rent my house as I at that time was planning to do in order not to be alone this winter. When I kept thinking about letting strangers take over and trying to shrink up into one little bed room I just decided I could not do it. So now I am alone again since Mrs. Musgrove went home. She stayed with me five weeks and by that time my hands were getting pretty strong so I tended the furnace until Nov. 21st when the first storm, (snow) came that morning I fixed the fire as usual, took out the ashes and tried to take them to the alley, but I got only *383 half way out there when I had to give up and set the hod down. I am more or less staggery and uncertain of equilibrium so I left them and sent for Steve Fuller who had promised to tend furnace for me when I needed him, and since then he comes each morning & does all that needs to be done, leaving enough coal broken up so that I can keep my fire thru the day and keep it over at night. If I stay on here I hope to get the furnace converted to an oil burner next summer. I am about to lose my courage. I do so dread the winter alone, except for Corky. He is a lot of company but he gets so dirty when the snow melts and there is soft earth around. Yes, he it was who caused my accident but he was acting in line of duty for as I started out with him on the leash, we had barely got thru the back door when he saw a strange dog inside the rail on my little porch & he made a lunge toward it, throwing me off balance and I pitched to the ground with my arms flung forward and hands pointed right into the ground. That all belongs to the past now, and I never take him on a leash anymore. He spends most of the time out of doors now and some in the basement. He has not wakened me but once in the night and that was because a storm door came unlatched and was swinging in the wind, so I had to get up and fasten it to make him quiet again.
"I do wish I could live in an apartment somewhere & let this house go while properties are in demand. However, there is none to be had here. I would be willing to fix up an apartment in my upstairs if I could get the material and workman to do it, but that is impossible at present. What makes me anxious now is the weakness I have in my back and limbs. I cannot account for it, but I do not think of walking anywhere on the street any more without my cane because I am afraid I might go down any time any where and I am so afraid of falling and afraid I might get so I couldn't walk. If that should happen, what could I do?
"I am looking so well that everyone speaks of it, still I have that awful weakness. I have taken quite a few adjustments from the chiropractor and they seem to help a lot sometimes, but not always. However, I think I shall continue for a while longer until I think I have given it a real test. There are two good osteopaths connected with the hospital now Dr. McDonald from Powersville and Dr. Judd from Pollock. What scares me most is when that sciatic nerve that got me down two years ago gives me a stab in the hip. Well I suppose you may be wondering why I am taking up your valuable time with all this. Well I'll tell you it is just because I want some to know that old age is creeping up and if I am not in as good condition as I should be I want some one to know about it and maybe give me some advice about what to do.
"My life long friend Mrs. D.F. Riggs is confined to her bed now and has been for eight weeks. The doctors intend to keep her there for at least six more. She has high blood pressure and a tired heart. She is two or three years younger than I. We all hope she can be up and around again. She is also almost completely blind.
"There is something else I want you, George, and the family to know and that is that should I pass out, (which I surely will some time) well whenever that happens if I leave any worldly goods worth possessing I should want it divided equally among you five children. I have a few bonds on which I have placed the names of my nephews and nieces as beneficiaries, and I had once thought of making a will to leave whatever else I have to the Van Voast grand children, but that did not seem to me to be fair to Edith & Audra who have no children. I do not know whether or not I should make a will or just how to make it as things now stand.

*384 "In any event I have all arrangements made with Comstocks here to take charge if I should be stricken while here alone, with no one to look after such things, and there is a contract to that effect in my safety box in the bank.
"I am expecting with reasonable confidence to be here for at least a few more years, but one can never tell. You know just what is coming up, and I see no reason for putting everything off for someone else to attend to at the last minute. I have also had a marker for myself placed in the Walton lot in the cemetery here, beside my sister, who was my mother for twenty-nine years.
"Hoping you are all well and that your winter is not too cold I will sign off and go look for some thing to eat.
 "Yours with love, Cora."
Facts. The relevant facts are:
Prior to the year 1913 twice-married H.R. Van Voast lived on a farm which he owned and operated near Unionville, Missouri. By his first wife he had six offspring, namely: Jess, George, Mary Audra, Edith, Zelma and Milo.
In 1909 and following the death of his first wife, H.R. Van Voast took unto himself as his second wife, Cora Goss, whom he married at Unionville, Missouri. No issue was born of the marriage to Cora Goss.
The undisputed evidence shows that Cora Goss was a very intelligent person who understood her business affairs and conducted them in an orderly manner; that prior to her marriage she was a stenographer and that she had been employed in that capacity in a lawyer's office as well as in the office of a large business firm.
At the time of H.R. Van Voast's marriage to Cora Goss, the ages of his offspring ranged upwards from that of Milo, the youngest, then between eight and nine years, to that of Jess the oldest who then was a grown man.
In the year 1910 Jess moved to Turner, Montana, where he has since resided. That same year George took up a government homestead near Geraldine, Montana, where, except for two years spent in the service during World War I, he has continuously resided.
H.R. Van Voast and his family, with the exception of Jess and George, continued to reside on the farm in Missouri until the year 1913 when the father and his family moved to Montana where the father filed upon a homestead located near Turner, Montana, and there he and his wife Cora Goss Van Voast continuously resided until the fall of 1938 when H.R. Van Voast died intestate.
As before stated under the law of Montana, all the property of one who dies without disposing of it by will passes immediately to the heirs of the intestate subject to the control of the district court for administrative purposes. R.C.M. 1947, secs. 91-101, 91-401, 91-402 and 91-403; In re Wilcox' Estate, 122 Mont. 290, 294, 201 Pac. (2d) 989, 991; In re Clark's Estate, 105 Mont. 401, 412, 74 Pac. (2d) 401, 114 A.L.R. 496; Gaines v. Van DeMark, 106 Mont. 1, 8, 74 Pac. (2d) 454.
Under the express provisions of the law of Montana all the estate, personal and real, left by H.R. Van Voast passed instantly upon his death, one-third to Cora Van Voast, the surviving wife and the remaining two-thirds in equal shares to the six surviving offspring born of H.R. Van Voast's first marriage, pursuant to the provisions of R.C.M. 1947, sec. 91-403.
It was the law that gave the estate of the intestate H.R. Van Voast to his heirs,  that designated such heirs and that specified the share that each would have. It was the law that gave to the intestate's widow the largest unit of the estate being one-third thereof. It was the law that gave to each of the intestate's six offspring a smaller unit of the estate, each being entitled to but an undivided one-ninth thereof.
The law gave the widow a share in the estate that was three times greater than the share given to any other single heir. This in explanation of the testimony of Mary Audra Van Voast Staples concerning the estate left by her father H.R. Van Voast and the share that went to the *385 widow Cora to this effect: "He [H.R.] left no will, so we [respondents] decided that it would be best to give her [Cora] the largest unit of the estate, and she was automatically retired on that."
The provisions of R.C.M. 1947, secs. 91-101, 91-401, 91-402 and 91-403, gave to his heirs the estate left by the intestate H.R. Van Voast. These provisions of the law enabled the widow and the respondents as the heirs of H.R. Van Voast, deceased, to succeed to the entire H.R. Van Voast estate.
In the instant case the appellants claim that these same provisions, secs. 91-101, 91-401, 91-402 and 91-403, give to them, as the only heirs of Cora Goss Van Voast, deceased, the estate left by her in Montana.
Following her husband's death Cora Van Voast continued to live at Turner, Montana, for a while. Next she moved to Great Falls where she resided a short time but when Zelma Van Voast Bonebright became ill with cancer at her home in Culbertson, Montana, Cora went there and attended and ministered to Zelma until the latter's death which occurred in 1940, following which Cora returned to Unionville, Missouri, where she established her permanent home and continuously resided until her death on December 7, 1949.
George Van Voast testified that in 1910, being the year after his father married Cora, he (George) homesteaded near Geraldine, Montana, where he has since resided so that Cora had little to do with the rearing of either George or his older brother Jess, both of whom were grown at the time their father, H.R. Van Voast, and Cora intermarried.
George also testified that he had acquired his father's old farm home near Unionville, Missouri; that because of such farm he made frequent business trips to Missouri on which occasions he always stayed at Cora's home in Unionville; that when Cora purchased her home there she sought and received George's advice in the matter and that when she paid off the mortgage on her home he took her to the courthouse and had the papers recorded.
At all times the relationship between Cora and both the appellants and the respondents had been cordial and she had kept up a more or less regular correspondence with them. These circumstances shed considerable light on the decedent's intent in writing the letter wherein she gave a clear cut, detailed, informative account of her exact situation, a precise statement of the problems with which she was confronted and a modest request for "some advice about what to do."
The decedent had obtained and acted on George's business judgment and advice in the past and here, as she was considering whether she should make a will or not, Cora was again seeking George's advice "about what to do."
Prelude. In the sixth from the last paragraph of her informative letter Cora stopped in the midst of her recital to write a prelude which clearly discloses her intent and plainly states why she was writing the letter.
She wrote: "Well I suppose you may be wondering why I am taking up your valuable time with this. Well I'll tell you it is just because I want some to know that old age is creeping up and if I am not in as good condition as I should be I want someone to know about it and maybe give me some advice about what to do."
The next paragraph of the letter, being the fifth from the last, is purely informative and concerns the physical condition of Cora's life long friend Mrs. Riggs.
Language Relied Upon. The words appearing in the first sentence of the fourth paragraph from the last of decedent's letter are the ones relied upon by respondents to sustain their claim that the letter constitutes a will by which all of decedent's estate situate in Montana passed to respondents as legatees and devisees rather than to the appellant heirs who claim under the provisions of R.C.M. 1947, secs. 91-101, 91-401, 91-402 and 91-403.
In such first sentence of said fourth paragraph from the last the decedent wrote that she wanted George and the family to know "that should I pass out * * * whenever that happens if I leave any worldly goods worth possessing I should want it divided among you five children." Emphasis supplied.
*386 The verb "want" as used in the above quoted sentence means to desire or wish for. The word "should" is twice used in the sentence as an auxiliary,  first of the verb "pass" and next of the verb "want" in the conditional expression of uncertainty or withheld thought or desire.
"Goods." The only property mentioned in the above quoted sentence is personal property namely "goods."
"In wills `goods' is nomen generalissimum, and, if there is nothing to limit it, will comprehend all the personal estate of the testator, as stocks, bonds, notes, money, plate, furniture, etc." Emphasis supplied. Black's Law Dictionary (3rd Ed.), p. 851. To same effect see 2 Bouvier's Law Dictionary (Rawle's 3rd Rev.) at pages 1364, 1365.
"According to its natural and ordinary meaning, the word [goods] does not include lands." Ballentine's Law Dictionary, p. 556.
Even if the script letter were to be construed as a valid will under Montana law it would be but a bequest of personal property having its situs in Montana and it would not pass title to any of decedent's lands here situate.
The conditional expression of the decedent's withheld thought or desire to have her personal property worth possessing "divided" among the five surviving stepchildren is qualified by the next sentence which excludes certain personal property, namely, "a few bonds" on which the decedent stated she had "placed the names of my nephews and nieces as beneficiaries."
"Whatever Else." Also in the fourth from the last paragraph of her letter after first mentioning her worldly goods and then her bonds, the decedent said "and I had once thought of making a will to leave whatever else I have to the Van Voast grandchildren, but that did not seem to me to be fair to Edith & Audra who have no children." Emphasis supplied.
The portion of the letter just quoted reveals that the decedent "had once thought of making a will" and to provide therein that "whatever else I have" should pass thereunder but that on further consideration such first contemplated disposition of "whatever else" she had did not appear to be fair and thus the thought of executing a will died aborning so she never made any writing which she intended or considered to be a will.
And in the concluding sentence of the fourth from the last paragraph of her letter the decedent wrote: "I do not know whether I should make a will or just how to make it as things now stand."
The concluding phrase "as things now stand" means as things were then standing, namely on November 29, 1945, as decedent was concluding the writing of her lengthy longhand letter.
Here again does the decedent indicate that she did not intend, by the letter which she was then composing and writing, to make testamentary disposition of her property. It would seem clear that she neither intended nor did she consider the letter to be her will. As she was concluding her letter she apparently considered herself to be without a will; otherwise she would not have written, "I do not know whether I should make a will" and "I do not know * * * just how to make it [a will] as things now stand."
In this fashion did the decedent, Cora Van Voast, state her case with the evident intent and hope that upon reading her letter and learning therefrom her exact situation and problems George or someone would maybe give her "some advice about what to do" so that at another time and by another writing she could make a will if that should be the thing to do.
It would appear that this intelligent former stenographer in a law office well knew the difference between executing a solemn last will and testament and merely writing a simple letter stating her case and seeking some advice about what to do, if anything, about disposing of her propety when she should pass out.
In view of the facts shown by the record herein, may we conclude that this cautious, bright and understanding woman ever dreamed that the informative letter she was then writing for the one purpose of obtaining advice as to what she should do *387 at some future time about making a will would one day be filed and admitted to probate as and for her last will and testament?
In Farish v. Cook, 78 Mo. 212, 47 Am. Rep. 107, a testator gave and bequeathed to his wife "all my worldly goods, consisting of household furniture, clothing, beds and bedding, money and cattle; also whatever debts may be due me; likewise my house and lot I now occupy in the city of St. Louis, to be by her enjoyed during her life * * *" When he made the will and at his death the testator owned a tract of land situate in the Grand Prairie Common Fields which was not devised by the will nor mentioned therein unless it be included in the words "all my worldly goods." In holding that such tract was not included in the will and that it did not pass under the above quoted general terms of the will, the court said: "According to its natural grammatical and ordinary meaning, the word `goods' does not include lands. It includes only personal property. General usage has given it this meaning. This is its primary signification. If it possesses any other meaning in this will it must appear from the context * * * Upon the whole it seems to me that the testator did not intend to devise his lands under the terms `goods' * * * and that such an intent cannot be evoked from the context of the will without ignoring its obvious import and meaning."
In the case at bar unless decedent's script letter in and of itself can be regarded as an act carrying into effect the intention of the testatrix to make a testamentary disposition of her property, it is not entitled to probate. As the court said in Lilley's Estate, 11 Pa. Dist. & Co. R. 183, p. 185: "But it does not follow that every paper which expresses an intention of what is to be done with the writer's property after his death is for that reason legally testamentary. The paper itself must first disclose of itself that it was intended to operate as a will * * *."
In In re Zech's Estate, 70 S.D. 622, 20 N.W. (2d) 229, 230, a Christmas card which said, "I want you to know Herman's farm will be yours when I die", was held not to be a valid will.
In Thompkins v. Randall, 153 Va. 530, 150 S.E. 249, two script letters in the handwriting of the deceased were offered for probate. It appears that the deceased had a stepdaughter and also a granddaughter, both of whom he was very fond. To his stepdaughter Ida Thompkins he wrote a script letter saying, among other things, "I told you and Mary that this House & lot and Every thing is to be long to you and Mary Ida * * *" He also wrote a letter to his granddaughter, Mary Randall, in part saying, "I want you and Ida to know that this Home is for you and Ida & No body Else I would not do other Wise I hope you all Will have Faith in me * * *" The trial court refused to admit the letters to probate. In affirming such order the Supreme Court of Appeals of Virginia said that the letters which it was sought to have probated "do not show the testamentary intention with sufficient clearness, at the time the letters were written, to dispose of the property by the letters themselves. `Heirs are favored in law, and get the benefit of any doubt affecting their rights.' 2 L.R.A. 849. * * *
"Testamentary intent, we take it, means that the writing offered for probate must have been executed by the testator with the intent that such writing take effect as his last will. The letters offered for probate in this case show an absence of testamentary intent at the time they were written. To construe such letters as testamentary would be to make social correspondence a risky pastime." Emphasis supplied.
The Test. In 1 Page on Wills (3rd Ed.), sec. 57, p. 129, it is said: "In order that an instrument may amount to a will, it must show testator's intention to make a testamentary gift by that instrument, as distinguished from a gift to be made, or spoken of as already made, by some other instrument."
That the above is the rule in this jurisdiction see In re Watts' Estate, 117 Mont. 505, 160 Pac. (2d) 492.
As was said by this court in In re Augestad's Estate, 111 Mont. 138, 141, 142, 106 *388 P.2d 1087, 1088, "The cases also agree without exception that the animus testandi must appear. * * *"
The court, in In re Major's Estate, 89 Cal. App. 238, 264 Pac. 542, said: "In cases where doubt arises as to whether the instrument is a will or of some other character, the true test is whether the maker executed the document with animus testandi. Without this it cannot be a will. Proof that a party intended to make a disposition of his property similar to or identical with that contained in a certain paper which he has executed does not make such paper his will. * * * In other words, when it is claimed that the intention of a deceased was that a paper should stand for a last will and testament, it must be plainly and satisfactorily apparent that the testator intended the very paper to be his will. Unless it so appears, the paper must be rejected. Heirs at law are not to be disinherited unless such intention is clearly manifested and expressed with legal certainty."
The court in In re Kisling's Estate, 68 Cal. App. (2d) 163, 156, Pac. (2d) 57, 59, said: "Unless it be made to appear plainly and satisfactorily that the maker of the instrument intended that very paper itself to be his last will, such paper must be denied probate. And, where on its face the instrument is free from ambiguity, it may not be shown that the maker thereof intended it to operate differently than what the language used indicates." Emphasis supplied.
In the case of In re Estate of Button, 209 Cal. 325, 331, 287 Pac. 964, 967, the court said: "In order for a document to be the last will and testament of a deceased person, it must, in addition to meeting all other legal requirements * * * satisfactorily appear therefrom that the decedent intended by the very paper itself to make a disposition of his property in favor of the party claiming thereunder." Emphasis supplied.
In the case of In re Wunderle's Estate, 30 Cal. (2d) 274, 181 Pac. (2d) 874, 878, the court said: "No particular words are necessary to show a testamentary intent but it must satisfactorily appear from the document offered as the last will and testament that the decedent intended, by the very paper itself, to make a disposition of his property after his death in favor of the party claiming thereunder. Estate of Button, 209 Cal. 325, 331, 287 Pac. 964; [In re] Estate of Kelleher, 202 Cal. 124, 129, 259 Pac. 437, 54 A.L.R. 913; [In re] Estate of Branick, 172 Cal. 482, 484, 157 Pac. 238; [In re] Estate of Pagel, 52 Cal. App. (2d) 38, 44, 125 Pac. (2d) 853, 856. A case in which the facts are similar to those shown by the present record is Estate of Pagel, supra, where it was held that a letter written by the deceased lacked the necessary testamentary intent. The court said: `* * * the decedent made it perfectly clear by the language used in his letter that he did not intend the letter to act as a posthumous declaration, but on the contrary stated he desired that his posthumous disposition narrated in his letter should be declared in a last will and testament.'" Emphasis supplied. To the same effect see In re Spencer's Estate, 87 Cal. App. (2d) 591, 197 Pac. (2d) 351.
The letter relied upon in In re Augestad's Estate, 111 Mont. 138, 140, 142, 106 Pac. (2d) 1087, 1088, in part states: "I had thought to set up a testament, and temporarily any how. So that you and Finn could get a half part each! but make Finns part so, that he gets something such as $10 a month, for if he gets all, it will go all at once, he ought really not to have anything, but I thought anyhow temporarily, you shall get your share, if there is oil here then it could be much." This court, in affirming the order of the district court refusing to admit the above letter to probate as a holographic will, in part said: "However * * * we cannot find in the letter the essential feature of any will, holographic or otherwise, namely, the animus testandi. At most this letter expresses an intention, at some time in the future, to make a will and that his intention had been that when such will was made one-half of his property should go to the contestant, Finn Augestad, under some sort of a trust arrangement, and the other half should go the brother Arndt.
"While it is true that the law favors testacy, yet the intention of the deceased to dispose of property after his death by the *389 instrument in question must be clear. That intention does not so appear here." Emphasis supplied.
In the case now before this court, Cora Van Voast's script letter of November 29, 1945, fails to disclose any intention on the writer's part to dispose of property after her death by such particular letter. The letter is not testamentary in character and its words and language wholly fail to disclose the essential testamentary intent, i.e., the animus testandi.
In my opinion it was error for the district court: (1) To admit the script letter to probate; (2) to grant to the respondent Lee Staples letters of administration with the will annexed; (3) to find against the appellants and in favor of the validity of the script letter as a will; (4) to refuse to vacate and set aside its order of May 11, 1950; (5) to refuse to revoke the letters of administration issued to the respondent Lee Staples and (6) to order the dismissal of appellants' petition.
In the light of the law as applied to the undisputed facts the trial court's findings of fact, conclusions of law and order sustaining the validity of the script letter as well as the court's order appointing the respondent Staples as administrator should be annulled and vacated and the cause should be remanded to the district court for further proceedings as are in accord with the foregoing facts and the statutes and decisions cited.
ANGSTMAN, Justice (dissenting).
In my opinion the letter in question does nothing more than seek advice as to what to do to effect disposition of property of the writer upon her death. It is true that she expressed a desire that steps be taken to cause it to go to the stepchildren, but I think the letter itself negatives the idea that it was intended to dispose of property upon the death of the writer and that being so there was lacking the animus testandi necessary to make the letter a will.