NO. 91-309

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

TERRY N. TRIEWEILER,

      Plaintiff and Respondent,

-vs-

WILLIAM R. SPICHER and
EMILY SPICHER, husband and wife,

      Defendants and Appellants.

APPEAL FROM:    District Court of the Eleventh Judicial District,
               In and For the County of Flathead,
               The Honorable Robert S. Keller, presiding.

COUNSEL OF RECORD:

    For Appellant:

        Steven E. Cummings; Murphy, Robinson, Heckathorn, &
        Phillips, Kalispell, Montana.

    For Respondent:

        Brian Bulger, Attorney at Law, Great Falls, Montana

Submitted on Briefs: December 5, 1991

Decided: August 17, 1992

**FILED**

AUG 17 1992

Filed: *Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Honorable Edward P. McLean, District Judge, delivered the Opinion of the Court.

Defendants, William R. Spicher and Emily Spicher (Spichers), appeal from the judgment of the Eleventh Judicial District, Flathead County, granting summary judgment in favor of Plaintiff, Terry N. Trieweiler (Trieweiler). We affirm in part and reverse and remand in part.

We restate the dispositive issues as follows:

(1) Did the District Court err in finding as a matter of law that the Board of Directors appointed by the developer on July 17, 1990, was not validly appointed and had no authority to appoint members to a new Architectural Committee?

(2) Did the District Court err in finding that the Architectural Committee was reasonable in its determination not to approve Spichers' choice in roofing tile and exterior color?

In May 1989, Spichers purchased Lot 64 in the Grouse Mountain Subdivision in Whitefish, Montana, subject to a number of covenants including provisions for review by the Architectural and Environmental Control Committee (Committee) of any plans for new construction. The Committee was made up of five persons appointed by the Board of Directors of the Grouse Mountain Home Owners Association (Homeowners Association). The Committee operated under a set of Minimum Guidelines for Architectural Review in Grouse Mountain, Phase I (Guidelines), adopted in 1988 by the Homeowners

2

Association, which set minimum requirements for new construction.

The Spichers contracted with Scott Ping (Ping), a Whitefish contractor, to construct a home on Lot 64. In August 1989, Ping and the Spichers submitted a building plan to Trieweiler, who was a member of the Committee. The Committee (Committee I) approved the plan, with the following three exceptions: (1) the proposed siding material, (2) the proposed roofing tile, and (3) the proposed exterior color. After further efforts by Ping to gain Committee I's approval for these three items, Spichers retained an attorney who requested an appearance before Committee I. Trieweiler replied appearance before Committee I was not necessary and Committee I would not reconsider its determinations. At this point Spichers conceded to the wishes of Committee I on the siding material but continued to attempt to negotiate with Trieweiler for approval on the Spichers' choice of roofing tile and exterior color. In September 1989, Ping gave Committee I, through Trieweiler, samples of roofing tiles promoted as superior in quality to the tiles called for in the Guidelines. Committee I agreed to one of the samples which resembled cedar shakes. Spichers subsequently discovered the manufacturer did not recommend that specific tile for cold climates. The manufacturer did recommend the style Spichers had originally chosen. At that point Trieweiler told Ping he did not have time to deal with the problem further and was washing his hands of the entire matter. In light

3

of Trieweiler's statement Spichers instructed Ping to roof the house with the tile recommended by the manufacturer and to stain the home with the exterior color of their choice.

On November 15, 1989, Trieweiler filed, as a property owner in the subdivision, a complaint for injunctive relief alleging Spichers were applying roofing tile in violation of the minimum requirements in the Guidelines and were staining the home a gray color which had been specifically disapproved by Committee I.

On May 23, 1990, the Homeowners Association held its annual meeting and elected a new Board of Directors which appointed a new Committee (Committee II). Committee II granted Spichers an appearance before the Committee but chose not to take any action at that time. Because Committee II would not act, the original developer of the subdivision appointed a new Board of Directors on July 17, 1990. The new Board designated its own members as the new Committee (Committee III) and invited Spichers and Trieweiler to attend a meeting to resolve the controversy. Trieweiler declined to attend. Spichers did attend the meeting on July 30, 1990, and Committee III approved the Spicher residence as built.

On December 21, 1990, the District Court concluded Committee III was invalidly appointed and did not have authority to approve the Spicher residence as built. As a result Spichers did not have valid Committee approval for the roofing tile and exterior color used on the home and the home was in violation of the Guidelines.

4

In light of these findings the District Court granted summary judgment for Trieweiler, and ordered Spichers to remove and replace the roofing tile with a tile known as Spectile No. 122, to execute an agreement to replace the new roofing if it is damaged due to weather or incorrect application, and to repaint the exterior of the house. Spichers appeal.

I.

Subsequent to appeal Spichers filed with this Court a Motion to Permit Supplementation of Record on Appeal asking this Court to take into account circumstances occurring subsequent to the appeal on the issue of reasonableness of the Committee's determinations. Rule 9(f), M.R.App.P., permits supplementation of the record on appeal when something is omitted from the record ". . . by error or accident or is misstated therein . . ." Such is not the case here and Spichers' motion is denied.

II.

Did the District Court err in finding as a matter of law that the Board of Directors appointed by the developer on July 17, 1990, was not validly appointed and had no authority to appoint members to a new Architectural Committee?

On May 23, 1990, the Homeowners Association held its annual meeting and elected a new Board of Directors which appointed a new Committee (Committee II). Committee II granted Spichers an appearance before the Committee but chose not to take any action at

5

that time.    Because Committee II would not act, the original developer of the subdivision appointed a new Board of Directors on July 17, 1990.    The new Board designated its own members as the new Committee (Committee III) and invited the Spichers and Trieweiler to attend a meeting to resolve the controversy.    Trieweiler declined to attend.    The Spichers did attend the meeting on July 30, 1990, and Committee III approved the Spicher residence as built.

The District Court found as a matter of law that "the Board of Directors that was appointed by the developer on July 17, 1990, was not validly appointed, or in excess of the number of directors provided for, and as such, the July Board of Directors had no authority to appoint anyone, much less themselves, as members of [Committee III].    § 35-2-402(2), (3), and (4), MCA [1989]." Spichers argue the developer had the right under the Articles of Incorporation to appoint a Board of Directors.    Article VII of the Articles of Incorporation provides:

> The affairs of the Corporation shall be managed by a Board composed of at least five (5) directors but not more than seven (7) directors who need not be members of the Corporation.  The initial Board shall be composed of five (5) members.  A change in the number of directors may be made by amendment to the Bylaws of the Corporation.  Until such time as ninety percent (90%) of the lots or units of present and future phases of Grouse Mountain have been sold by the Developer, the directors shall be selected by the incorporator, or his successor or assign.  All directors shall be elected annually for a term of one (1) year unless otherwise provided in the Bylaws.  The names and addresses of the persons who are

6

to act in the capacity of directors until the election of their successors are: . . .

Article V of the Articles provides that "every person or entity who is a record owner of a fee or an undivided interest in a lot or unit" is a member of the Corporation. Article VI of the Articles provides that "[i]n all elections for directors, every member entitled to vote shall have the right to cumulate his vote and to give one candidate a number of votes equal to his vote multiplied by the number of directors to be elected or by distributing such votes on the same principal [sic] among any number of such candidates."

The members of the Association had the authority under the Articles to elect the new Board of Directors at its annual meeting on May 23, 1990. That Board had the authority under Article VIII of the Bylaws of Grouse Mountain Homeowners, Inc., to "appoint committees as deemed appropriate in carrying out its purpose." The Architectural Review Committee was a committee that had been formed by a prior Board under the authority of that provision to review plans for new construction to enforce the Minimum Guidelines for Architectural Review in Grouse Mountain, Phase I, which had been adopted by the Association membership.

Article VII of the Articles of Incorporation provides for a one-year term for elected directors on the Board. Section 35-2-403, MCA (1989), provides that "a director may be removed from

7

office pursuant to any procedure therefor provided for in the articles of incorporation." There are no provisions in the Articles of Incorporation of Grouse Mountain Homeowners, Inc., giving the developer the authority to remove a duly-elected Board of Directors prior to the end of the one-year term of office provided for in the Articles. Since the developer did not have the authority to remove the Board to appoint a new Board, any actions taken by the new Board and Committee III which was created by the new Board are invalid and unenforceable. We hold that the District Court did not err in finding as a matter of law that the Board of Directors appointed by the developer on July 17, 1990, was not validly appointed and had no authority to appoint members to a new Architectural Committee.

### III.

Did the District Court err in finding that the Architectural Committee was reasonable in its determination not to approve Spichers' choice in roofing tile and exterior color?

Both parties cite Gosnay v. Big Sky Owners Ass'n (1983), 205 Mont. 221, 666 P.2d 1247, in support of their legal arguments. Spichers also cite Higdem v. Whitham (1975), 167 Mont. 201, 536 P.2d 1185; Town & Country Estates Ass'n v. Slater (1987), 227 Mont. 489, 740 P.2d 668; and Hillcrest Homeowners Ass'n v. Wiley (1989), 239 Mont. 54, 778 P.2d 421. These four cases represent Montana case law on the issue of validity and enforceability of restrictive

8

covenants. None of the Montana cases address the issue currently before the Court dealing with reasonableness of determinations of a committee empowered with the right to approve or reject building plans.

It is clear the well-established rule in most jurisdictions is that a committee's power of approval must be governed by the applicable covenants and guidelines and must be reasonably exercised. This Court cited the rule in Gosnay v. Big Sky Owners Ass'n (1983), 205 Mont. 221, 227, 666 P.2d 1247, 1250; however, the issue of reasonable exercise of power of approval was not before the Court at that time. The Court hereby adopts this rule and applies it to the case now before the Court.

The majority of cases in other jurisdictions deal with the issue of validity and enforceability of covenants. There are few cases addressing the issue of reasonableness of the exercise of power of approval. Most of the cases that exist merely state the reasonableness rule, followed by a conclusive statement that the committee did (or did not) reasonably exercise its power of approval, with little or no discussion or analysis of how either the trial court or the appellate court reached its conclusion. We conclude that the better reasoned cases consider the determination of whether the exercise of power to approve construction plans was reasonable or arbitrary is a factual question to be determined in light of the circumstances. LaVielle v. Seay (Ky. 1966), 412

9

S.W.2d 587. Also see LaBlanc v. Webster (Kan. 1972), 483 S.W.2d 647; Donoghue v. Prynnwood Corp. (Mass. 1970), 255 N.E.2d 326; Rhue v. Cheyenne Homes, Inc. (Colo. 1969), 449 P.2d 361; Otwell v. West (Ga. 1964), 137 S.E.2d 291; Bramwell v. Kuhle (1960), 183 Cal.App.2d 767, 6 Cal.Rptr. 839; Shields v. Welshire Development Co. (Del. 1958) 144 A.2d 759; Alliegro v. Home Owners of Edgewood Hills, Inc. (Del. 1956), 122 A.2d 910 (examined the evidence to determine if the facts support finding power of approval was reasonably or arbitrarily exercised).

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), M.R.Civ.P. When the facts contained in the record are considered against the background of the rule that power of approval must be reasonably exercised, we conclude there are material issues of fact. Therefore the District Court erred in finding that the Architectural Committee was reasonable in its determination not to approve Spichers' choice in roofing tile and exterior color.

The Minimum Guidelines for Architectural Review in Grouse Mountain, Phase I, provide:

> The following are minimum requirements that have been applied by the Architectural Review Committee to new construction in Grouse Mountain, Phase I.
>
> . . .

10

5. _Stain_.  If wood siding or shingles are used on the exterior surface of the residence, they must be stained in a color or shade approved by the Architectural Committee.  Translucent stain is permitted on redwood or cedar exteriors.  However, opaque stain is required on fir exteriors.

6. _Roofing_.  Roofing materials must be cedar shake shingles or dimensional cut Class A fire-rated asphalt-fiberglass shingles.  If the latter type of shingle is used, the color is subject to approval by the Architectural Committee.

. . .  [Emphasis in original.]

The roofing material selected by Spichers was neither a cedar shake shingle nor a dimensional cut Class A fire-rated asphalt-fiberglass shingle.  Committee I originally rejected Spichers' choices but eventually did approve one of two samples of tile presented to the Committee.  Spichers subsequently discovered the approved tile was not recommended for cold climates and told their contractor to use the roofing tile that was their first choice. Spichers argue they did not violate the Guidelines because the tile they used was superior in quality.  The Guidelines set forth "minimum requirements," one of which is the "[r]oofing materials must be cedar shake shingles or dimensional cut Class A fire-rated asphalt-fiberglass shingles."  There is a material question of fact whether this requirement limits the roofing material to only those two choices or whether the minimum requirement only sets a minimum standard for quality.  This factual question must be determined by the trier of fact in light of the intent of the Association in

11

drafting the Guidelines and in light of the fact that Committee I eventually approved a tile that was not one of those two choices. There are also factual questions whether Committee I was reasonable in approving a tile not suitable for cold climates and whether Committee I had knowledge of the unsuitability of the tile at any time during its determination whether to approve the tile. These factual questions are in dispute and are material questions of fact precluding summary judgment in this case.

Committee I specifically disapproved the gray color Spichers chose to paint the exterior of their home stating that seven out of the last ten homes built in the neighborhood had been painted with some variation of gray, including the home immediately adjacent to the Spichers' home. Committee I did approve two shades of brown. Spichers respond that more brown homes than gray homes exist in the subdivision and therefore Committee I acted arbitrarily in its rejection of gray. The power of refusal must be exercised objectively, honestly and reasonably. Donoghue v. Prynnwood Corp. (Mass. 1970), 255 N.E.2d 326, 329. A committee may not subjectively impose its whims or aesthetic tastes on lot owners. Therefore a material question of fact exists regarding the objectivity and reasonableness of the Committee's refusal to approve the gray color preferred by Spichers.

In light of the foregoing, we find there are material questions of fact which must be determined by the jury in this

12

case, and the District Court erred in concluding that the Architectural Committee acted reasonably in its determination not to approve Spichers' choice in roofing tile and exterior color. We remand to the District Court for further proceedings consistent with this Opinion.

Affirmed in part; reversed and remanded in part.

_____
Honorable Edward P. McLean, District
Judge, sitting in place of Chief
Justice J. A. Turnage

We concur:

_____
Honorable Russell K. Fillner,
District Judge, sitting in place
of Justice R. C. McDonough

_____
Honorable Ted L. Mizner, District
Judge, sitting in place of Justice
John C. Harrison

_____
Honorable Larry W. Moran, District
Judge, sitting in place of Justice
Fred J. Weber

13

Honorable Thomas M. McKittrick, dissenting:

I dissent from the Majority opinion.

This case is about homeowners and their right to organize to establish reasonable standards for the aesthetic preservation and architectural consistency of their neighborhood and then rely on those standards when they are objected to by someone who is fully aware of their existence prior to purchasing his property.

This case is also about whether developers can establish a self-governing group of directors elected from among the homeowners who reside in the neighborhood developed and then, contrary to the Articles of Incorporation, Bylaws, and Restrictive Covenants, throw those people out of office when their decisions are inconvenient or contrary to the wishes of one of the developers.

In addition, this case is about whether a developer can impose restrictive covenants on other homeowners who purchase lots and build homes in his development, even though many of those homeowners incurred additional expense to comply with these requirements, and then arrogantly and deliberately ignore the requirements when he decides to build his own home in the same neighborhood.

Triewelier is a homeowner who filed an Injunction to enforce an intentionally violated covenant at the Grouse Mountain Development (Development), a subdivision near Whitefish, Montana.

In 1979, the general partner of the Development, Brian T. Grattan, filed with the Clerk and Recorder's Office of Flathead County, Montana, a Declaration of Conditions, Covenants and Restrictions. In relevant part paragraph 15 reads:

"Architectural Control. . . . that no building shall be

commenced upon the property until the plans and specifications were submitted and approved by the committee."

Pursuant to paragraph 15, the acting Board of Directors appointed an Architectural Committee. At the 1989 Annual Homeowners Meeting, Committee I submitted to the homeowners, for their approval, minimum Architectural Standards (Guidelines). The homeowners unanimously approved the guidelines at the meeting.

Prior to the guidelines approval, Committee I had mailed a copy of the guidelines to every owner of every lot in the development.

William R. Spicher (Spichers) was an original partner in the development, and in fact was one of its largest investors. As such, he was a partner of Grattans and was aware of the Articles of Incorporation, Bylaws and Restrictive Covenants. Spichers owned lot 64 in the development and had bought the land subject to the restrictive covenants. In late summer of 1989, Spicher contracted with Ping Construction (Ping) to build a home.

There is no dispute that all parties, including Spichers and Ping, knew of paragraph 15 (the covenant) and the guidelines. Yet, the Spichers, through Ping, chose to disregard the guidelines by submitting plans to build their home with an imitation-tile roofing - Material I - and stain their house a gray color. Committee I rejected:

(1) Material I because it was an imitation-tile concrete composition roofing material that did not meet the guidelines and had never been used in the development before; and

(2) the gray color stain because seven of the last ten homes built in the neighborhood were of some gray variation, including a home next to Spicher's lot.

Committee I, in a letter to the Spichers, stated that "Committee I [was] willing to consider a broad spectrum of earth tone colors."  Committee I "want[ed] to avoid [a] predominance of one or two colors [in an area] and the construction of homes in a row [of] the same color."

The Spichers through their contractor resubmitted three new colors and roofing material (Material II).  Committee I again rejected a gray color but approved a mushroom and Aspen tan color and as a compromise approved Material II on the condition the Spichers sign a written agreement to replace the roof if damaged by the weather.  The Spichers were insulted and tried to meet with Committee I members without Trieweiler present.  Trieweiler not wanting to waste any more of his time trying to hammer out a compromise with the Spichers, never again acted as an intermediary between the Spichers and Committee I.

The Spichers then retained an attorney who wrote a letter to Committee I.  Committee I wrote back saying the Spicher's actions destroyed any chance for compromise and that a meeting with the Spichers would not benefit either party.  Contrary to Committee I's decision, the Spichers did what they "wanted to do in the first place . . ." and built their home with the rejected imitation-tile Material I and stained the house a gray color.

In May of 1990 the homeowners held a meeting to elect a new Board of Directors.  Mr. Spicher's former partner and original developer (Grattan) approached the homeowners with a deal.  Grattan proposed that he would not invoke his power to appoint a new Board of Directors under Article VII of the Articles of Incorporation, but would assign it to the homeowners at the meeting if the home-owners would allow him to vote his unassessed eleven lots.  The deal was struck and the homeowners elected a new Board of Directors who in turn appointed a new Architectural Committee (Committee II).

Spichers went before Committee II seeking approval. Committee II, largely a result of Grattan's and Spicher's votes at the May meeting, refused to approve Spicher's home. For that reason, and that reason only, Grattan broke his promise to the homeowners and unilaterally terminated the Board of Directors. He appointed himself and four others to the new Board. Prior to Grattan's appointment of the new Board, Mr. Spicher contacted each new director and asked them if they would serve on his "New Board of Directors". The new Board appointed Committee III. Committee III approved Spicher's home "as built".

The Majority has trouble following Gosnay v. Big Sky Owners Assn., 205 Mont. 221, 666 p.2d 1247. The case is clearly on point but the Majority chooses to create a different result. In Gosnay, the Supreme Court reversed the District Court and enforced a similar restrictive covenant as a matter of law, against an owner with a "jackleg" fence. 205 Mont. at 227. The "construction of a fence require[d] prior approval by the Architectural Committee. . . . The Architectural Committee refused Gosnays permission to build their fence [since the] Gosnay's fence [was] contrary to Big Sky's overall plan for openness." Id. The Court went on to state that although some fences had been approved, a jackleg fence had never been approved.

Similarly, here, Committee I needed to approve all plans to build in the development. Committee I rejected the Spichers plans because the imitation-tile Material I failed to meet the guidelines or overall plan for uniform roofing and had never been used in the subdivision before. Rejection of the color gray was based on the overall plan to protect the property owners' investments.

This Court, as a matter of law, should have followed its prior decision in Gosnay and enforced the restrictive covenant against the Spichers. But they did not.

Instead the Majority uses creative reasoning when it states that "whether the exercise of power to approve construction plans was reasonable or arbitrary is a factual question to be determined in light of the circumstances." The Majority, however, seems to conveniently forget to consider the question of reasonableness in light of all the circumstances. Spichers built their home the way they "wanted to build it in the first place." They used imitation-tile Material I for their roof and stained their home gray, thus violating:

(1) the restrictive covenant because they did not get prior approval from any legally appointed committee to use Material I or the color gray;

(2) the guidelines because the imitation-tile Material I violated the overall plan for uniform roofing as well as fire and weather safe roofs, and the gray color because the overall plan allowed the Committee to control the color of exterior materials used on homes. The Committee felt that the domination of one color would give the homes in the development the appearance of tract housing. The Committee rejected the color to protect the neighborhood's property values. See Gosnay v. Big Sky Owners Assoc., 205 Mont. 221, 666 p.2d 1247, 1250 (1983).

The Majority found a question of fact in the guidelines. They asked, does the roofing guideline mean only two choices or does it mean that superior material can be used? There is a question of fact here only if the guidelines are read alone. The facts, however, should come to this Court's rescue and clear the muddied waters. Committee I has answered the Court's and Spicher's question. There are more than two choices, but Committee I, or at least a legally appointed committee, had to approve the choices that were not spelled out in the guidelines. Further, Committee I specifically rejected Material I and sent a message to the Spichers not to use Material I. Spichers ignored that message

and so has the Majority of this Court.  Spichers could have used a listed roofing material, but chose to use Material I after Committee I vehemently rejected Material I because it was imitation-tile never used in the subdivision.  Committee I supplied the answer to the question - Material I did not meet the guidelines - no question of fact exists as to Material I - it did not meet the guidelines.

Next the Majority finds a question of fact in whether or not Committee I objectively and reasonably rejected the gray color.  Again, the Majority seems to ignore the facts.  The facts clear the path to show, as a matter of law, the Committee acted objectively and reasonably.

Seven of the last ten homes built in the neighborhood were of some gray variation, including a home adjacent to Spichers.  The Committee felt another gray home in the area would give the appearance of tract housing which would devalue the neighborhood properties.  In trying to protect property owners' values, the Committee precluded Spichers use of the gray color.  See Rhue v. Cheyenne Homes Inc., 449 p.2d 361, 363 (Colo. 1969).  The Committee did not, as the Majority suggests, impose its whims or aesthetic tastes on the Spichers.  See Donoghue v. Prynnwood Corp., 255 NE2d 326, 40 ALR3d 858 (Mass. 1970).  To the contrary, Committee I objectively and reasonably followed the overall plan and tried to protect the investment of home and lot owners.  No question of fact existed.  The Committee acted reasonably for the protection of all owners within the development.

Since there are no questions of fact, the Gosnay decision should control and the District Court's Summary Judgment ruling should be upheld by this Court.  Instead the Majority chooses to be creative and in their rush to achieve their desired result

Page 19

and keep this litigation alive have failed to consider the repercussions which will seriously impair the rights of property owners to establish and control architectural development and aesthetic preservation in their neighborhoods.


_Thomas M. McKittrick_
Thomas M. McKittrick
District Court Judge

August 17, 1992

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Steven E. Cummings
MURPHY, ROBINSON, HECKATHORN & PHILLIPS
P.O. Box 759
Kalispell, MT 59903-0759

BRIAN BULGER
Attorney at Law
1815 Fourth Avenue
Great Falls, MT 59401

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy