No. 87-91

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

---

TOWN & COUNTRY ESTATES ASSOCIATION,

Plaintiff and Respondent,

-vs-

KEN SLATER and ALICE D. SLATER,

Defendants and Appellants.

---

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable G. Todd Baugh, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Pedersen & Conrad; Carol Hardy Conrad, Billings,
Montana

For Respondent:

Gary Beiswanger, Billings, Montana

---

Submitted on Briefs: May 14, 1987

Decided: July 28, 1987

Filed: JUL 28 1987

_____
Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

Defendants Ken and Alice Slater appeal a November 5, 1986 permanent injunction by the Thirteenth Judicial District Court, Yellowstone County. The injunction prevented the Slaters from building a house in Town & Country Estates until a Design Review Committee approves the Slaters' building plans and specifications. We reverse and vacate the injunction.

The Slaters present three issues for our review:

1. Did the District Court err in finding that a restrictive covenant which allows a Design Review Committee (DRC) to disapprove house plans and prevent construction is enforceable, when the disapproval is based upon "harmony of external design?"

2. Did the District Court err in finding that the covenant had not been abandoned, although none of the plans for previously-constructed houses had been approved by the DRC?

3. Did substantial credible evidence support the District Court's findings that the DRC acted reasonably, in good faith, and not arbitrarily or capriciously?

Town & Country Estates Association (TCE) is a subdivision in Billings, Montana. TCE contains sixteen single-family houses, one duplex, and several vacant lots. The deeds to the TCE lots incorporate by reference a "Declaration of Covenants, Conditions and Restrictions," which was publicly recorded on December 20, 1973.

The Declaration, in Article V, grants architectural control to the DRC and outlines relevant aesthetic factors.

> No residential . . . structure . . .
> shall be made . . . upon the Properties
> . . . until plans and specifications

2

> showing the nature, kind, shape, height, materials, colors and location of the same shall have been submitted to and approved in writing as to <u>harmony of external design</u>, location and relation to surrounding structures and topography, the construction, colors, and the materials to be used in the construction have been approved in writing by a Design Review Committee consisting of five members appointed by the Board of Directors of Town & Country Estates Association. [Emphasis added.]

Article V does not place a minimum value on TCE houses, which vary in size, shape, color, building materials, and architectural style. However, the TCE houses all have a minimum of 2,400 square feet and shake roofs.

Prior to 1986, all TCE houses had either been built or approved by the developer of the subdivision. In early 1986, the Slaters expressed an interest in a TCE lot. They were aware of the prior approval restriction of Article V. In April of 1986, they learned that the developer had left the area, and that a five-member DRC was being formed to review Slaters' house plan. The plan was the first to be reviewed by the newly-formed DRC. Slaters' proposed house had a shake roof, wood siding, and 2,600 square feet of living space.

On May 1, 1986, Slaters bought the TCE lot before receiving approval of their house plan. On May 19, 1986, Slaters received a letter from DRC rejecting Slaters' plan because the house did not "conform to the general tone of the area." The letter also stated, "We would suggest that the price of the lot commands a residence more near the size of houses in the surrounding area. As you know, the neighborhood consists of $200,000 plus homes, and this is the kind of conformity that you should look to." Without approval, Slaters began house construction on August 5, 1986.

3

On August 6, 1986, TCE obtained a temporary restraining order prohibiting the Slaters from building, alleging that Slaters' house violated the minimum size restrictions contained in the Declaration. Based on the court's order, Slaters resubmitted their plans to DRC. On August 26, 1986, the DRC again rejected the plan and stated, "we find that the structure is not in harmony of external design to surrounding structures and topography as specified in [the Declaration]." (Emphasis added.) On November 5, 1986, the District Court granted a permanent injunction against Slaters, until they complied with the TCE Declaration.

Issue 1

Did the District Court err in finding that a restrictive covenant which allows a Design Review Committee to disapprove house plans and prevent construction is enforceable, when the disapproval is based upon "harmony of external design?"

The District Court based its permanent injunction on the fact that the Slaters had not complied with Article V. The court held that the restrictive covenant was enforceable, and that the committee's review was performed in good faith and not unreasonable.

Slaters contend that a prior approval covenant is not enforceable if it contains no specific objective standards. Slaters argue that the term "harmony of external design" is too vague and ambiguous to be enforceable. Slaters further argue that their house has major features found in existing TCE houses, and therefore their house would not differ in aesthetic merit from the other houses.

TCE contends that Article V is enforceable, even without express standards of application, because the DRC acted reasonably and in good faith. TCE admits that other TCE

4

houses share some of the same physical characteristics and materials of the Slater house, but argues that Slaters' design is not as attractive and harmonious as the existing houses.

Our review of this issue is guided by Higdem v. Whitham (1975), 167 Mont. 201, 208-209, 536 P.2d 1185, 1189, where we held:

> The overriding policy of individual expression in free and reasonable land use dictates that restrictions should not be extended by implication or enlarged by construction.

Article V establishes several restrictive factors upon which the DRC must predicate its approval. We will closely review any enlargement of restrictions which conflict with reasonable land use, and which hinder substantive due process. As we held in State v. District Ct. (1980), 187 Mont. 126, 130, 609 P.2d 245, 248, "Moreover, restrictive covenants are to be strictly construed; ambiguities therein are to be construed to allow free use of the property." However, the free use of the property must be balanced against the rights of the other purchasers in the subdivision.

Each purchaser in a restricted subdivision is both subjected to the burden and entitled to the benefit of a restrictive covenant. Generally, these covenants are valid if they tend to maintain or enhance the character of a particular residential subdivision. However, such covenants are enforceable only when used in connection with some general plan or scheme. The approval of plans by an architectural control committee is one method which helps maintain the value and general plan of subdivision construction.

We recognize that aesthetic considerations have a place in prior approval covenants, and that there are no absolute standards to guide a committee's judgment and taste.

5

Aesthetic terms must be sufficiently flexible to cover a variety of house designs. The term "harmony of external design" is not ambiguous per se. However, a restrictive covenant which fails to define the standard of approval is too vague to be enforceable.

The record reveals that every TCE house had a unique external design, in a cacophony of styles. The houses ranged from single and split-level to bi-level, the roofs from gable-end and hip to mansard, and the siding from stucco and wood to stone. The styles were a hybrid mix of traditional, Tudor, ranch, and contemporary. The only common design characteristics were a 2400 square foot minimum size and a shake roof. When questioned at the show cause hearing on August 29, 1986, DRC was unable to state any design standard for TCE.

If the subdivision itself lacks consonance, the Slaters' plan cannot lack harmony. In the context of TCE and Slaters' plan, the term "harmony of external design" lacks the mutuality of obligation central to the purpose of a restrictive covenant. In view of the wide variety of designs, no one seemed burdened by the covenant except the Slaters.

Slaters' plan was not discordant with others in the subdivision. The proposed house would be split-level contemporary, 2600 square feet, with a gable-end shake roof and wood siding. The single most distinguishing feature of the Slaters' house was its cost, which was not an express factor under Article V. The proposed house would be worth approximately $135,000. The other TCE houses appraised above $200,000. As revealed in its initial rejection letter, DRC seems more concerned with harmony of appraisal than harmony of design. However, DRC's review of external design was limited to the factors set forth in Article V, and to

observable characteristics of all other houses in the subdivision.

The approval or disapproval of plans by the DRC must be based upon an objective design standard. Without a quantifiable standard to guide them, the decision of DRC is unenforceable. The record shows neither a uniform standard of design, nor a general plan regarding "harmony of external design" in the subdivision. We hold that the Slaters' house fell well within the broad architectural spectrum of TCE houses. Applied to the TCE subdivision and Slaters' plan, we hold that Article V lacks sufficient objectivity, and is vague to a degree that denies substantive due process to the Slaters.

We therefore vacate the injunction based on this issue, and need not proceed to appellants' issues of notice and good faith.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices

7