No. 95-417

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

MAURICE JARRETT, HARRY S. WALLS,
JUDITH S. KENNEDY, KEN KIVLIN, JOAN
BELL, ELIZABETH M. BROGAN, WILLIAM
BROOKS, JAKE CROUNSE, ANNETTE DUNSETH,
HENRY AND MARY ENDLER, EDGAR H. GREENE,
THOMAS AND ANN JOCHUM, KENNETH AND
MYRNA KAUTZ, ELWOOD T. KENNEDY, EDWARD
LENAHAN, WILLIAM McCOSTLIN, JOE MULLINS,
JERRY AND ALPHA MYERS, VINCE AND OLGA
ORME, CARRIE PASEWARK, CARL AND BETTY
PENLY, JOHN AND JUNE ROACH, DELPHIN
AND ROSARIO SANTOS, DOUG STEIN, EUNICE
AND BETTY TAYLOR, and KEVIN ROBERTS,



FILED

JUL 25 1996

Ed Smith

CLERK OF SUPREME COURT
STATE OF MONTANA

Plaintiffs and Respondents,

v.

VALLEY PARK, INC. and ST. MARIE VILLAGE
ASSOCIATION, INC.,

Defendants and Appellants

APPEAL FROM: District Court of the Seventeenth Judicial District,
In and for the County of Valley,
The Honorable John C. McKeon, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

J. David Penwell, Attorney at Law,
Bozeman, Montana

For Respondents:

Kathleen H. Richardson; Young, Brown &
Richardson, Havre, Montana

Submitted on Briefs: February 29, 1996

Decided: July 25, 1996

Filed:

_____
Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

Valley Park, Inc. and St. Marie Village Association, Inc. appeal from the judgment entered on the order of the Seventeenth Judicial District Court, Valley County, granting the plaintiffs' motion for summary judgment and permanently enjoining enforcement of the restrictive covenant at issue. We reverse and remand with instructions.

We restate the issues on appeal as follows:

1. Did the District Court err in granting the plaintiffs' motion for summary judgment based on its conclusion that the restrictive covenant at issue is void and unenforceable?

2. Are Valley Park, Inc. and St. Marie Village Association, Inc. entitled to summary judgment?

3. Did the District Court abuse its discretion in permanently enjoining enforcement of the restrictive covenant at issue?

Valley Park, Inc. (Valley Park) is the developer of a retirement community (the village of St. Marie) located in Valley County, Montana, and the original owner of all of the property comprising the village of St. Marie. In September of 1988, it subjected the village of St. Marie to Montana's Unit Ownership Act by filing the statutorily-required declaration. See § 70-23-103, MCA. Pursuant to the Act, each unit owner must comply with the covenants governing the property. See § 70-23-506, MCA. By the time this action commenced, Valley Park had sold 208 lots and

2

condominium units to other individuals and entities and still owned the remaining unsold property and 464 condominium units.

On August 12, 1992, Valley Park executed the "First Amended Protective Covenants of the Village of St. Marie" (Protective Covenants). By their express terms, the Protective Covenants run with the land and are binding on Valley Park and its grantees, successors and assigns. The stated purpose of the Protective Covenants is "maintaining a uniform and stable value, character, architectural design, use and development of the property."

The Protective Covenants are divided into eleven sections which cover subjects ranging from the use of the property to the procedure for amending the Protective Covenants. Section II establishes an architectural committee and contains numerous restrictions on alterations and improvements by lot and unit owners; under many of the restrictions, owners must obtain approval from the architectural committee prior to undertaking alterations or improvements. Section III provides for the establishment of the St. Marie Village Association, the purpose of which is to carry out the "intent, purpose and function of [the Protective Covenants]."

On August 1, 1994, Maurice Jarrett applied to the architectural committee for permission to install an eighteen-inch television satellite receiving dish on the exterior wall of his condominium unit. The architectural committee denied his request based on Section II(Q) of the Protective Covenants (Covenant II(Q)) which prohibits the installation of "television satellite receiving dishes" within the village of St. Marie except by Valley Park or

3

its designate.  Approximately three weeks later, he applied to install a television antenna and the architectural committee approved his request.

In November of 1994, Maurice Jarrett and thirty-four other owners of either lots or condominium units (collectively, Jarrett) filed a complaint against Valley Park and the St. Marie Village Association (collectively, VPI) .  Jarrett requested the District Court  to declare Covenant II(Q) void  and unenforceable  and permanently enjoin VPI from enforcing it.  In response, VPI denied that the covenant was void and unenforceable.  Both parties conducted  discovery.

In May of 1995,  both Jarrett and VPI moved for summary judgment.  The District Court granted Jarrett's motion, declaring Covenant II(Q) void and unenforceable and ordering that VPI be permanently enjoined from enforcing it.  Thereafter, Jarrett filed a motion to amend, pursuant to Rule 59(g), M.R.Civ.P., to include an award of attorney's fees and the District Court awarded Jarrett $5,000 in attorney's fees. VPI appeals.

> 1.  Did the District Court err in granting Jarrett's motion for summary judgment based on its conclusion that Covenant II(Q) is void and unenforceable?

Summary judgment is proper when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  Rule 56(c), M.R.Civ.P.  We review a district court's grant of summary judgment de novo, applying the same Rule 56(c), M.R.Civ.P., criteria used by that court.  In re Estate of Lien (1995), 270 Mont. 295, 298, 892 P.2d 530, 532 (citation omitted).

4

Ordinarily, such a review requires that we first determine whether the moving party met its burden of establishing both the absence of genuine issues of material fact and entitlement to judgment as a matter of law. See Estate of Lien, 892 P.2d at 532.

In this case, however, the parties agree on the material facts relating to the legal issue of whether Covenant II(Q), which prohibits the installation of television satellite receiving dishes in the village of St. Marie except by VPI or its designate, is enforceable. Through their cross motions for summary judgment, each party asserted entitlement to judgment as a matter of law. The District Court granted Jarrett's motion, concluding that Covenant II(Q) is ambiguous, lacking quantifiable and objective standards of review by the architectural committee and insufficiently connected to a general plan or scheme. We address in turn the District Court's conclusions.

a. Ambiguity

We interpret restrictive covenants by applying the rules of construction applicable to contracts. Gosnay v. Big Sky Owners Ass'n (1983), 205 Mont. 221, 227, 666 P.2d 1247, 1250 (citation omitted). The language of the covenant is to be understood in its plain and ordinary sense. Hillcrest Homeowners Ass'n v. Wiley (1989), 239 Mont. 54, 56, 778 P.2d 421, 423; § 28-3-501, MCA. "[W]here the words [used in restrictive covenants] are plain, unambiguous, direct and certain and admit of but one meaning, then it is the duty of this Court to declare what the terms of the covenants contain . . . ." Higdem v. Whitham (1975), 167 Mont.

201, 208, 536 P.2d 1185, 1189.

Covenant II(Q) states:

No television satellite receiving dishes shall be placed on any portion of the property except by [VPI] or its designate. Radio and television antennas and aerials may be placed on the property as approved by the architectural committee.

The first sentence of the covenant, which is at issue here, absolutely prohibits installation of television satellite receiving dishes except by VPI or its designate. The second sentence authorizes the placement of radio and television antennas in the event the architectural committee approves such placement.

In interpreting Covenant II(Q), the term "television satellite receiving dish" must be understood in its ordinary and popular sense. See Hillcrest, 778 P.2d at 423. Here, the parties do not dispute that the eighteen-inch dish Jarrett wanted to install is, in fact, a "television satellite receiving dish." Thus, by the plain meaning of the language used, Covenant II(Q) prohibits installation of satellite dishes except by VPI or its designate.

Nor does Jarrett contend that the term "television satellite receiving dish" is susceptible to two definitions or understandings. Rather, Jarrett argues that the term "television satellite receiving dish" is ambiguous under the facts of this case due to advancing technology. In this regard, Jarrett states that

"television satellite receiving dishes" were commonly understood to be large, metal contraptions installed on the ground . . . [which were] arguably unsightly. The new eighteen inch dishes can be affixed to the exterior of buildings in the same way that radio and television antennas and aerials are, and are no larger than other antennas and aerials.

6

Notwithstanding the myriad values and impacts of "advancing technology," technology does not--in and of itself--render ambiguous language which is otherwise direct and clear. Nothing in the language used in Covenant II(Q) relates to the size of the dish. Moreover, nothing in Covenant II(Q) qualifies the prohibition based on the means or manner by which the television satellite receiving dishes are affixed to buildings. We conclude that Covenant II(Q) is unambiguous and, according to the plain meaning of the language used, prohibits the installation of television satellite receiving dishes--regardless of size or manner of installation--except by VPI or its designate.

Jarrett's final argument relating to the term "television satellite receiving dish" used in Covenant II(Q) is that the District Court properly relied on Higdem in determining that applying that language to the eighteen-inch dishes would result in a prohibited extension of the covenant to cover a "question later developing." We disagree.

In Hisdem, the defendants commenced construction of a garage on their property and the plaintiffs sued based on restrictive covenants governing use of the property in the subdivision. Hisdem, 536 P.2d at 1187. The restrictive covenants at issue provided, in relevant part, that purchasers of lots in the subdivision were prohibited from

> erect[ing] any building other than a single detached
> dwelling house, either with or without a garage or other
> like and necessary outbuilding . . . [and from using] any
> building to be erected upon said lot of land . . for
> any purpose other than those incidental to the use of a
> private dwelling house only; this provision being

7

intended to prohibit the use of any housing for . . . any commercial purpose . . .

Hisdem, 536 P.2d at 1187.

The defendants testified that they had abandoned any intention of using the garage for "odd jobs" due to opposition from neighbors, that the garage that came with their house was inadequate based on the number of vehicles their family owned and that the new garage was needed as additional storage space for vehicles, tools, lawn equipment and firewood. Hisdem, 536 P.2d at 1187. Without referencing a specific covenant, the district court concluded that "the additional building, its size and the purpose intended are in violation of the restrictive covenants." Hisdem, 536 P.2d at 1188.

On appeal, we set forth the threshold rules for interpreting restrictive covenants. Where the words are plain, unambiguous, direct and certain and admit of but one meaning, it is our duty to declare what the terms of the covenants contain and not to insert a limitation not contained therein. Hisdem, 536 P.2d at 1189. Moreover, restrictive covenants must be strictly construed and should not be aided or extended by implication or enlarged by construction. Hisdem, 536 P.2d at 1189-90. We noted that the covenant at issue made no reference to the size of garages permitted and, on that basis, rejected the plaintiffs' efforts to support the size restriction the district court read into the covenants. Accordingly, we concluded that the

> district court should not have broadly interpreted and imposed these restrictive covenants in terms of what the parties would have desired had they initially been

8

confronted with questions later developing. *Hisdem,* 536 P.2d at 1190. While our use of the term "broadly interpreted"--in a situation where the district court's interpretation rendered the covenant more restrictive than its plain and unambiguous language could support--is not absolutely clear, our meaning was that the district court could not "broaden" the covenant by adding a limitation not contained therein. Thus, in *Higdem,* the district court erred by imposing the restrictive covenants beyond their terms, in contravention of the rules of construction applicable to restrictive covenants, in order to encompass what the neighboring landowners might have desired "had they initially been confronted with questions later developing."

Here, while the District Court determined that the term "television satellite receiving dishes" was not clearly defined, we have concluded above that the language is clear and unambiguous. Based on its erroneous determination of ambiguity, the District Court then apparently relied on *Hisdem* in further determining that inclusion of the eighteen-inch dishes within Covenant II(Q)'s prohibition would improperly "extend" the restriction to cover the later developed technology.

The reverse, however, is true. As discussed above, the term "television satellite receiving dishes" is clear and unambiguous and Covenant II(Q) does not contain size, or other, limitations on the meaning of the term. In order to exempt the newer dishes from the prohibition contained in Covenant II(Q), it would be necessary to insert limitations regarding the size of, and/or manner of

9

installing, television satellite receiving dishes which do not exist in the unambiguous language used in the covenant. Injecting such limitations would result in a covenant which, for example, prohibited the installation by anyone other than VPI or its designate of television satellite receiving dishes more than eighteen inches in diameter which are installed by placement on the ground or on a roof, but not on an exterior wall; such a judicially-revamped covenant, however, would bear little resemblance to the plain language of Covenant II(Q) prohibiting the installation of television satellite receiving dishes except by VPI or its designate. Like the neighboring landowners in Higdem, Jarrett clearly would have preferred a differently worded covenant had this "question later developing" with regard to smaller dishes installed in a manner similar to television and radio antennas existed at the time Covenant II(Q) was written. However, we must strictly construe covenants and may not insert limitations not contained therein. Hisdem, 536 P.2d at 1189-90. We hold that the District Court erred in concluding that Covenant II(Q) is ambiguous and, on that basis, unenforceable.

*b. Lacking Quantifiable and Objective Standards*

The District Court further based its determination that Covenant II(Q) is void and unenforceable on its conclusion that

> [t]here is no quantifiable and objective standard of review for approval by the architectural committee . . . [and that] [l]acking such standards, the actions of the architectural committee are subject to such arbitrary determination of sufficient degree as to deny substantive due process.

The District Court's conclusion apparently is based on Town &

10

Country Estates Ass'n v. Slater (1987), 227 Mont. 489, 740 P.2d 668.

Town & Country Estates involved a prior-approval covenant which provided that:

> No residential . . . structure . . . shall be made . . . upon the Properties . . . until plans and specifications . . . have been submitted to and approved in writing as to *harmony of* exterior *design* . . . by a Design Review Committee . . . .

Town & Country Estates, 740 P.2d at 669-70. The owners of a lot presented plans for a proposed house with a shake roof, wood siding and 2,600 square feet of living space. Town & Country Estates, 740 P.2d at 670. The Design Review Committee rejected the plans, stating that the home was not in harmony of external design as required by the covenant and that "'the neighborhood consists of $200,000 plus homes, and this is the kind of conformity that you should look to."' Town & Country Estates, 740 P.2d at 670. The owners began construction without approval and the subdivision homeowners' association sued. Town & Country Estate, 740 P.2d at 670.

We recognized that, although prior-approval covenants properly may be based on aesthetic considerations, every house in the subdivision at issue had a "unique external design, in a cacophony of styles[;]" the covenant did not contain any design standard and the Design Review Committee was unable to state one. Town & Country Estates, 740 P.2d at 671. Moreover, the record reflected that the submitted plans met the only common design characteristics extant in the subdivision, which related to minimum size and type

11

of roof. We concluded that where a prior-approval covenant fails to define a standard of approval for the entity charged with review and approval of plans, it is too vague to be enforceable. Town & Country Estates, *740* P.2d at 671. Since the subdivision at issue had a "broad architectural spectrum," and the owners' proposal fell within that spectrum, we held that the covenant was vague to a degree which denied the owners substantive due process. Town & Country Estates, *740* P.2d at 671.

Town & Country Estates involved a prior-approval covenant which was vague due to a lack of design standards under which the required review and approval of plans would be conducted. In the present case, Covenant II(Q) contains a prohibition against the installation of television satellite receiving dishes by unit owners. The prohibition totally precludes such installation and, as a result, no plans or applications are subject to review by the architectural committee. Thus, the quantifiable and objective standards for review which were necessary in Town & Country Estates have no applicability here. We hold, therefore, that the District Court erred in concluding that the absence of quantifiable and objective standards of review renders Covenant II(Q) unenforceable.

*c. Insufficiently Connected to General Plan or Scheme*

The District Court also concluded that Covenant II(Q) is not enforceable because "[i]t does not clearly connect the restriction to any general plan or scheme" in that no statement in the Protective Covenants specifically shows how the restriction on installation of satellite dishes is connected to the stated purpose

of the Protective Covenants. That purpose, as set forth above, is to maintain "a uniform and stable value, character, architectural design, use and development of the property." The District Court apparently relied on Town & Country Estates in reaching its conclusion.

As discussed above, Town & Country Estates involved a prior-approval covenant requiring "harmony of external design." In addressing the covenant, we set forth the rules to be applied when the terms of a restrictive covenant were ambiguous; we also stated that, generally, restrictive covenants

> are valid if they tend to maintain or enhance the character of a particular residential subdivision. However, such covenants are enforceable only when used in connection with some general plan or scheme.

Town & Country Estates, 740 P.2d at 671. In the context of the prior-approval covenant at issue, we observed that approval of plans by an architectural committee is one method which helps maintain the value and general plan of subdivision construction. We also noted that prior-approval covenants necessarily and properly include aesthetic considerations not susceptible of absolute standards. Town & Country Estates, 740 P.2d at 671. While the term "harmony of external design" was not per se ambiguous, we determined that it was too vague to be enforceable absent defined standards of approval. Town & Country Estates, 740 P.2d at 671. On that basis, we concluded on the record before us that "neither a uniform standard of design, nor a general plan regarding 'harmony of external design"' existed. Town & Country Estates, 740 P.2d at 671.

13

Our statement and application of the "maintain and enhance" and "general plan or scheme" principles in Town & Country Estates occurred in the context of a prior-approval covenant to which those principles had a substantially direct relationship. Such a context is lacking in the present case. Here, as discussed above, Covenant II(Q) is neither ambiguous per se nor vague as a result of the absence of quantifiable and objective standards of approval. Thus, the referenced Town & Country Estates principles are of limited applicability in the case presently before us.

Moreover, it is clear that the Town & Country Estates principles are not ironclad rules susceptible of concrete and clear application. Covenants are generally "valid if they tend to maintain or enhance the character" of the property and are "used in connection with some general plan or scheme." Town & Country Estates, 740 P.2d at 671 (emphasis added). To the extent the "maintain and enhance" and "general plan or scheme" principles apply in a given case, it is sufficient that the particular covenant at issue generally can be said to further, and not be at odds with, the stated purpose of the protective covenants. Such a covenant tends to maintain and enhance the character of the property and is being used in connection with a general plan or scheme, as required by Town & Country Estates.

Subsequent to Town & Country Estates, we decided Hillcrest. There, the defendants had completed construction of a garage on their subdivision lot in late 1980 or early 1981; by 1987, no residence had been built and the homeowners' association filed suit

14

contending that the garage violated a covenant restricting use of the lot to residential purposes. <u>Hillcrest,</u> 778 P.2d at 422. The district court concluded that the garage did not violate the covenant and the association appealed, contending that a garage by itself, without a residence, was inconsistent with the "residential purposes" limitation. <u>Hillcrest,</u> 778 P.2d at 422.

In setting forth the principles applicable to our interpretation of restrictive covenants, we first cited to <u>Town & Country Estates</u> for the proposition that such covenants are generally valid if they tend to maintain or enhance the character of a particular subdivision; we then enunciated the principles that covenants must be construed to give their language its ordinary and popular meaning and that plain and unambiguous language will control our interpretation. <u>Hillcrest,</u> 778 P.2d at 422-23. We construed the ordinary meaning of the term "residential purposes" and concluded that a garage not used in conjunction with a residential dwelling violated the covenant at issue. <u>Hillcrest,</u> 778 P.2d at 423. Although we made a passing reference to the "maintain or enhance" principle, we did not apply it when faced with covenant language which was plain and unambiguous. Here, as in <u>Hillcrest,</u> we have concluded that the covenant at issue is plain and unambiguous; thus, the approach we used in <u>Hillcrest</u> is more directly applicable to the case presently before us than that used in <u>Town & Country Estates.</u>

We recognize, and have stated above, that a covenant which is clearly at odds with the stated purpose of the overall covenants

15

and the general plan for the properties subjected to those covenants cannot be enforced. The reason is that such a covenant, no matter how plain and unambiguous the language, cannot be harmonized with the overall covenants of which it is a part. In such a circumstance, interpreting and enforcing only the plain language of one covenant would violate our obligation to read the covenants as a whole rather than reading any one covenant in isolation. See Hillcrest, 778 P.2d at 422-23; Gosnav, 666 P.2d at 1250 (citation omitted).

Conversely, however, we are obligated to enforce a covenant containing plain and unambiguous language wherever possible as a result of our obligation to refrain from inserting language not contained therein (Hisdem, 536 P.2d at 1189) and because covenants are generally binding, by their terms and pursuant to § 70-23-506, MCA, on each owner of property subject to the covenants. Thus, a plain and unambiguous covenant will be upheld if it is possible to harmonize it with the general plan for the property which is stated as the purpose of the overall covenants.

Here, Covenant II(Q) is plain and unambiguous in prohibiting the installation of television satellite receiving dishes by individual lot or unit owners. It is not at odds with the general plan for the village of St. Marie, as stated in the Protective Covenants, of maintaining a uniform character, use and development of the overall community. Moreover, Covenant II(Q) generally can be said to further that purpose by limiting the number and location of receiving dishes. While Jarrett contends that the installation

16

by VPI's designate of three ten-foot satellite dishes at Unit 192-A of the village of St. Marie undercuts Covenant II(Q)'s validity in some way, such installation tends to maintain the uniform character and development of the property by concentrating the installations in one location. Nothing more is required of a plain and unambiguous covenant. We conclude, therefore, that Covenant II(Q) is sufficiently connected to a general plan for the uniform and stable character and development of the village of St. Marie and that the District Court erred in concluding otherwise.

In summary, the District Court erred with regard to each of the conclusions upon which it based its ultimate conclusion that Covenant II(Q) is void and unenforceable. We hold, therefore, that the District Court also erred in granting Jarrett's motion for summary judgment on that basis.

2. Is VPI entitled to summary judgment?

In the usual summary judgment case where we reverse an order of the district court granting summary judgment, that resolution is based on our conclusion that genuine issues of material fact exist which preclude the moving party's entitlement to judgment as a matter of law. Under that circumstance, a reversal of the district court necessitates a remand for trial in which the factual issues will be determined by the trier of fact. Where all of the facts bearing on the resolution of the legal issues are before us, however, this Court has the power to reverse a district court's grant of summary judgment and direct it to enter summary judgment in favor of the other party. Matter of Estate of Langendorf

17

(1993), 262 Mont. 123, 128, 863 P.2d 434, 438; Duensing v. Traveler's Companies (1993), 257 Mont. 376, 386, 849 P.2d 203, 210.

As stated above, the parties in the present case agree that the material facts are undisputed. We concluded in Issue 1 that Covenant II(Q) is clear and unambiguous in prohibiting installation of television satellite receiving dishes except by VPI or its designate and that it is sufficiently connected to the general plan for the village of St. Marie to be enforceable. Based on those conclusions, we hold that VPI is entitled to summary judgment in its favor on the enforceability of Covenant II(Q).

> 3. Did the District Court abuse its discretion in issuing a permanent injunction enjoining enforcement of Covenant II(Q)?

We review a district court's grant or denial of an injunction to determine if the court abused its discretion. See Butler v. Gennann (1991), 251Mont. 107, 114, 822 P.2d 1067, 1072; Sampson v. Grooms (1988), 230 Mont. 190, 194, 748 P.2d 960, 963. In addressing the foregoing issues, we held that the District Court erred in granting Jarrett summary judgment and, further, that VPI is entitled to summary judgment in its favor on the enforceability of Covenant II(Q). On those bases, we also hold that the District Court abused its discretion in permanently enjoining VPI from enforcing Covenant II(Q).

We reverse the District Court's grant of summary judgment in Jarrett's favor and vacate its related award of attorney's fees. We remand for entry of summary judgment in favor of VPI on the enforceability of Covenant II(Q) and for proceedings on VPI's

18

entitlement to attorney's fees pursuant to the Protective Covenants

_____
                Justice

We concur.

_____
        Chief Justice


_____


_____


_____
           Justices


19

Justice W. William Leaphart, dissenting


I dissent. As the District Court correctly concluded, the restrictive covenant at issue is not tied to a common plan or scheme for the Village of St. Marie, and it confers a personal benefit upon the designate--in this case the brother of the developer who drafted the covenants. Paragraph II(Q) of the restrictive covenants provides that:

> No television satellite receiving dishes shall be placed on any portion of the property except by Valley Park, Inc. or its designate. Radio and television antennas and aerials may be placed on the property as approved by the architectural committee.

Thus, as the covenant makes clear, satellite dishes are not prohibited by the covenants. Rather, the covenant merely requires that the satellite dishes must be installed by VPI or its designate. Further, there is no absolute prohibition against radio and television antennas and aerials which are arguably more unsightly than the 18" DSS dish at issue here. If, as the Court asserts, Paragraph II(Q) is enforceable because it is tied to, or enhances, the common plan or scheme of the development there must first be some common plan or scheme. As Paragraph II(Q) demonstrates, there is no such common plan or scheme--antennas and aerials may be installed on the property. More interestingly, so can satellite dishes as long as they are installed by VPI or its designate. Clearly, there is no uniform plan to be maintained where antennas and aerials may be installed on the condominium units

As the District Court aptly noted, the covenant:

> does not clearly connect the restriction to any general plan or scheme. There is no statement whatsoever within the covenants that shows how the restrictions on the use of television satellite receiving dishes is connected to this stated purpose. Rather, it appears that the restrictive covenant exists merely to meet the developer's promise to provide exclusive television satellite service to a family member.

The fact that only VPI, the developer, or its designate, may install satellite dishes appears to be an exclusive franchise granting VPI and/or the designate a personal benefit not tied to the common plan of the Village of St. Marie.

As the Court recognizes, restrictive covenants are valid "if they tend to maintain or enhance the character of a particular residential subdivision. However, such covenants are enforceable only when used in connection with some general plan or scheme." Town & Country Estates, 740 P.2d at 671. Although the Court speculates that Paragraph II(Q) "tend[s] to maintain or enhance the character" of the property and is connected to a common plan or scheme, this speculation is insufficient to enforce the covenant-- especially when coupled with the District Court's specific finding that the restrictive covenant served only to fulfil a personal promise to a family member. Satellite dishes are permitted in the development if installed by VPI or its designate. Further, the architectural committee approved Jarrett's request for a television antenna. I fail to see how lending our judicial imprimatur to an exclusive franchise contributes to the common plan or scheme as required by Town & Country Estates.

Restrictive covenants which serve a valid purpose of mutual

21

benefit to all lot owners are enforceable; restrictions that inure solely to the benefit of the developer at the expense of the owner's unrestricted use and enjoyment of their premises are not. DeWolf v. Usher Cove Co. (D. R.I. 1989), 721 F. Supp. 1518, 1531 (citing Urban Farms, Inc. v. Seel (N.J. Sup. Ct. App. Div. 1965), 208 A.2d 434, aff'd, 217 A.2d 888 (1966)). The covenant at issue here falls into the second category and, as the District Court correctly concluded, it is not enforceable. Accordingly, I would affirm the judgment of the District Court.

_____
Justice

Chief Justice J. A. Turnage and Justice William E. Hunt, Sr., join in the foregoing dissent of Justice W. William Leaphart.

_____
Chief Justice

_____
Justice