No. 98-582

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 111

294 Mont. 354

981 P.2d 771

IN RE THE ESTATE OF

CHARLES KURALT,

Deceased.

APPEAL FROM: District Court of the Fifth Judicial District,

In and for the County of Madison,

The Honorable Frank M. Davis, Judge presiding.

No

COUNSEL OF RECORD:

For Appellant:

James H. Goetz, Brian M. Morris; Goetz, Gallik, Baldwin &

Dolan, Bozeman, Montana

For Respondent:

Todd R. Hillier; Schraudner & Hillier, Bozeman, Montana

William S. Dockins; Williams, Jent & Dockins, Bozeman, Montana

Submitted on Briefs: February 11, 1999

Decided:

Filed:

_____

Justice W. William Leaphart delivered the Opinion of the Court.

**¶1. On July 4, 1997, Charles Kuralt (Mr. Kuralt) died in a hospital in New York City. His widow, Suzanna "Petie" Baird Kuralt (Petie), thereafter filed a petition in the state courts of New York for probate of his estate. On September 15, 1997, Petie, as the Domiciliary Foreign Personal Representative of the Estate of Charles Kuralt (the Estate), secured Montana counsel and filed a Proof of Authority pursuant to § 72-4-309, MCA (1995), in the Fifth Judicial District Court, Madison County, seeking to probate certain real and personal property owned by Mr. Kuralt in Madison County, Montana.**

**¶2. On September 30, 1997, Appellant Patricia Elizabeth Shannon (Shannon), an intimate companion of Mr. Kuralt for nearly thirty years, filed a Petition for Ancillary Probate of Will. This petition challenged the application of Mr. Kuralt's New York will to the real and personal property in Madison County. In part, the basis for Shannon's petition was a letter, dated June 18, 1997, which she had received from Mr. Kuralt shortly before his death indicating that he intended Shannon to "inherit" 90 acres along the Big Hole River. Shannon claimed that the letter constituted a valid holographic will that entitled her to Mr. Kuralt's real property in Madison County and, therefore, that the property should not be allowed to pass under the antecedent terms of Mr. Kuralt's New York will.**

**¶3. The Estate filed a Response and Objections to Petition for Ancillary Probate on November 10, 1997. On December 5, 1997, a hearing on Shannon's petition was set for March 3, 1998. Deposition and written discovery ensued. On the day of the scheduled March 3, 1998, hearing, the Estate filed a Motion for Summary Judgment and accompanying brief, arguing that Mr. Kuralt's June 18, 1997 letter expressed, at most, only a future intent to make a will, but not a present testamentary intent to devise the Montana property to Shannon.[(1)]**

**¶4. Notwithstanding the Estate's pending motion for summary judgment, the**

evidentiary hearing on Shannon's petition began on March 3, 1998, with the presentation of Shannon's case in chief. Thus, on March 3 and 4, 1998, the District Court heard "extrinsic evidence" bearing upon Mr. Kuralt's intent in writing the letter of June 18, 1997. This evidence showed, *inter alia*, that Mr. Kuralt had already transferred 20 acres of his land along the Big Hole River to Shannon in 1997, and that although that transaction had been structured as a "sale," it had been in substance a gift because Mr. Kuralt had secretly supplied the $80,000 in purchase money to Shannon before the ostensible transfer took place. Further, this extrinsic evidence suggested that, prior to Mr. Kuralt's fatal illness, Mr. Kuralt and Shannon had planned to transfer the remaining 90 acres of Mr. Kuralt's property along the Big Hole River in the same manner--as a sham "sale"-gift transaction--in the fall of 1998.

¶5. On April 30, 1998, the District Court heard argument on the Estate's motion for summary judgment and thereafter, on May 26, 1998, entered an Order and Memorandum granting partial summary judgment to the Estate.[2] In this order, the court agreed with the Estate's position and held that the June 18, 1997 letter "clearly contemplates a separate testamentary instrument not yet in existence to accomplish the transfer of the Montana property." Shannon appeals from the order of the District Court granting partial summary judgment to the Estate. We reverse the District Court and remand for trial because there are genuine issues of material fact.

## Issues Presented

¶6. There are two issues on appeal:

¶7. (1.) Was the District Court correct in concluding that summary judgment was appropriate because the evidence raised no genuine issues of material fact?

¶8. (2.) Did the District Court err in concluding that the letter of June 18, 1997, was not a valid holographic will because it expressed no present testamentary intent?

## Factual Background

¶9. Mr. Kuralt and Shannon first met in 1968 in Reno, Nevada, when Mr. Kuralt brought his CBS show "On the Road" to Reno to cover the creation and dedication of the "Pat Baker Park," a project which Shannon had spearheaded. During that

weekend, Mr. Kuralt, a married man, invited Shannon to dinner. Thus began a protracted personal relationship between Mr. Kuralt and Shannon, lasting nearly thirty years until Mr. Kuralt's untimely death on July 4, 1997. Mr. Kuralt and Shannon took pains over the years to keep their relationship secret, and were so successful in doing so that even though his wife, Petie, knew that Mr. Kuralt owned property in Montana, she was unaware, prior to Mr. Kuralt's death, of his relationship with Shannon.

¶10. From 1968 to 1978, Shannon and Mr. Kuralt saw each other every two-to-three weeks for several days at a time. Indeed, Mr. Kuralt maintained close contact by telephone and mail, and spent a majority of his non-working time with Shannon during this ten-year period. Although Mr. Kuralt and Shannon spent less time together over the remaining twenty years of their relationship, they maintained meaningful personal and financial ties. The couple regularly vacationed together, frequently traveling around the United States, as well as Europe.

¶11. Mr. Kuralt also established close, personal relationships with Shannon's three children, acting as a surrogate father and providing them with emotional and material support which continued into their adult lives. For example, Mr. Kuralt paid the entire tuition for Shannon's eldest daughter to attend law school and for Shannon's son to attend graduate school. Over the years, in fact, Mr. Kuralt was the "primary source of support" for Shannon and her children, providing them with substantial sums of money on a regular basis--usually $5,000 to $8,000 per month.

¶12. In the 1980s, Mr. Kuralt and Shannon formed a limited partnership called "San Francisco Stocks," which packaged and sold frozen cooking stocks. Mr. Kuralt provided all the capital for the partnership, while Shannon and her two children ran the day-to-day operations of the business. San Francisco Stocks operated for approximately five years, closing in 1988. At that time, Shannon moved to London, England, where Mr. Kuralt paid for Shannon to study landscape gardening at the Inchbald School of Design. During this time period, Mr. Kuralt and Shannon traveled regularly around Ireland.

¶13. In 1985, Mr. Kuralt purchased a home in Ireland and then deeded the property to Shannon as a gift. That same year, Mr. Kuralt purchased a 20-acre parcel of property along the Big Hole River in Madison County, near Twin Bridges, Montana. On this parcel, Mr. Kuralt and Shannon constructed a North Carolina-style cabin. In

1987, Mr. Kuralt purchased two additional parcels along the Big Hole River which adjoined the 20-acre parcel, one parcel upstream and the other parcel downstream of the cabin. These two additional parcels constitute approximately 90 acres, and are the primary subject of this appeal. Also in 1987, Mr. Kuralt purchased the old Pageville Schoolhouse located on Montana Highway 41 between Twin Bridges and Dillon, and Mr. Kuralt and Shannon moved the old schoolhouse to one of the newly-purchased parcels with plans to renovate the structure and utilize it as a retirement home.

¶14. On May 3, 1989, Mr. Kuralt executed a holographic will, which stated as follows:

May 3, 1989

In the event of my death, I bequeath to Patricia Elizabeth Shannon all my interest in land, buildings, furnishings and personal belongings on Burma Road, Twin Bridges, Montana.

*Charles Kuralt*

*34 Bank St.*

New York, NY 10014

Mr. Kuralt mailed a copy of this holographic will to Shannon.

¶15. However, Mr. Kuralt thereafter executed a formal will, on May 4, 1994, in New York City. In this will, Mr. Kuralt proclaimed: "I, CHARLES KURALT, a resident of the City, County and State of New York, declare this to be my Last Will and Testament and revoke all my prior wills and codicils." With respect to real property owned by Mr. Kuralt, the will provided:

TWO: I devise all my real property (including any condominium) which is used by me as a residence or for vacation purposes, together with the buildings and improvements

thereon, if any, to my wife, PETIE, if she shall survive me.

. . . .

FIVE: All the residue and remainder of my property and estate, real and personal, of whatever nature and wherever situate, including any property not effectively disposed of by the foregoing provisions of this Will, but excluding any property over which I have any power of appointment or disposal which power I hereby expressly do not exercise (hereinafter referred to as my "residuary estate"), I dispose of as follows: [the will then proceeds to gift the entire residuary estate outright to Petie, except for a credit shelter trust benefiting the Kuralts' two children].

The will makes no specific mention of the description or location of any of the real property, in Montana or elsewhere, that had been owned by Mr. Kuralt. The beneficiaries under Mr. Kuralt's Last Will and Testament are his wife, Petie, and the Kuralts' two children; neither Shannon nor her children are named as beneficiaries. In fact, Shannon was not even aware that Mr. Kuralt had executed his Last Will and Testament until institution of the probate proceedings at issue in this appeal.

**¶16. On April 9, 1997, Mr. Kuralt deeded his interest in the original 20-acre parcel with the cabin along the Big Hole River to Shannon. Although Shannon ostensibly "paid" Mr. Kuralt $80,000 for this parcel, those funds in fact came from Mr. Kuralt, who, some time earlier, had begun sending Shannon installments of money to accumulate the necessary "purchase" price. It appears that Mr. Kuralt and Shannon dressed this gift up as a sale so as to keep their long-standing personal relationship a secret. After the filing of the deed to the 20-acre parcel, Shannon sent Mr. Kuralt, at his request, a blank buy-sell real estate form. Apparently, Mr. Kuralt's intent was to deed the additional 90 acres along the Big Hole River to Shannon. At Shannon's behest, however, Mr. Kuralt and Shannon agreed that this transfer should be accomplished in much the same manner as they had previously negotiated the "sale" of the 20-acre parcel with the cabin--by Mr. Kuralt providing the purchase money so that the gift-transaction could be disguised as a sale. They further agreed that the transaction would be consummated in September of 1997 when Shannon, her son, and Mr. Kuralt had agreed to meet at the Montana cabin.**

**¶17. Tragically, Mr. Kuralt became suddenly ill and entered a New York hospital on**

**June 18, 1997. On that same date, Mr. Kuralt wrote a letter to Shannon in which he expressed grave concern for his health and arguably sought to devise the remainder of the Montana property to Shannon:**

June 18, 1997

Dear Pat--

Something is terribly wrong with me and they can't figure out what. After cat-scans and a variety of cardiograms, they agree it's not lung cancer or heart trouble or blood clot. So they're putting me in the hospital today to concentrate on infectious diseases. I am getting worse, barely able to get out of bed, but still have high hopes for recovery . . . if only I can get a diagnosis! Curiouser and curiouser! I'll keep you informed.

I'll have the lawyer visit the hospital to be sure you <u>inherit</u> the rest of the place in MT. if it comes to that.

I send love to you & [your youngest daughter,] Shannon. Hope things are better there!

Love,

C.

Enclosed with this letter were two checks made payable to Shannon--one for $8,000 and the other for $9,000. After this letter was mailed, Mr. Kuralt did not have any formal testamentary document drawn up devising the 90-acres of Montana property to Shannon. Thus, Shannon sought to probate the letter of June 18, 1997, as a valid holographic codicil to Mr. Kuralt's formal 1994 will, a claim which the District Court rejected in its summary judgment ruling. Shannon appeals.

Discussion

¶18. (1.) Was the District Court correct in concluding that summary judgment was appropriate because the evidence raised no genuine issues of material fact?

¶19. Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56 (c), M.R.Civ.P. We review a grant of summary judgment *de novo*, and, in so reviewing, this Court employs the same Rule 56(c), M.R.Civ.P., criteria as a district court. Jarrett v. Valley Park, Inc. (1996), 277 Mont. 333, 338, 922 P.2d 485, 487.

¶20. Shannon aptly labels the "strange procedural posture" of this case as "quixotic." From the outset of this dispute, Shannon and her attorneys pushed for an early resolution at trial because Shannon is presently experiencing "penurious circumstances." The Estate, in turn, sought to delay the institution of trial on the merits, repeatedly requesting additional time for preparation and discovery. At the start of the evidentiary hearing on March 3, 1998, the Estate again requested a continuance and, at that time, also filed its Motion for Summary Judgment. The District Court, while granting the Estate additional time in which to complete their anticipated discovery, denied the Estate's request for a continuance. In allowing Shannon to proceed with the presentation of her case in chief, the District Court stated:

Well, I'm going to expedite this case; and I'm going to do it by first denying the motion to continue. But I'm going to grant the [E]state a right, after the evidence is introduced here today, which should be helpful to the [E]state, to complete their contemplated discovery. I'm going to permit them to recall any witnesses which the Petitioner puts on today for cross-examination; and of course, . . . to call any witnesses of their own. We're in a search for the truth, and we're going to pursue it with dispatch if it takes all summer.

¶21. Then, during the "expedited" evidentiary hearing which ensued, counsel for the Estate objected to Shannon's presentation of "extrinsic evidence" bearing upon the question of whether Mr. Kuralt's letter contained the requisite *animus testandi* to render it a valid holographic will:

We're here for a June 18, 1997, document, and whether or not that document is a holographic codicil to Mr. Kuralt's May 4, 1994, will. The letter speaks for itself. We believe that it's clear and unambiguous; and in that matter, because of that, extrinsic evidence is not permitted to be considered. Now, this appears to be in the form of extrinsic evidence; and I make a standing objection to these proceedings, to any further evidence, because of that.

In response, counsel for Shannon cited Montana case law and a Montana statute in support of the argument that, irrespective of ambiguity, "extrinsic evidence is allowed on holographic wills." The District Court apparently agreed with Shannon since it overruled the Estate's "standing objection" to the presentation of extrinsic evidence on Mr. Kuralt's intent.

**¶22. Thus, the District Court allowed the presentation of extrinsic evidence relevant to the question of Mr. Kuralt's intent in writing the letter of June 18, 1997. Regardless of whether the court admitted that evidence because it found the letter to be ambiguous or whether the court allowed the presentation of extrinsic evidence because it agreed with Shannon's argument that such evidence may be discretionarily admitted in any holographic will dispute, the result is the same: extrinsic evidence was admitted showing that Mr. Kuralt had previously gifted 20 acres along the Big Hole River to Shannon while disguising the transaction as a sale; that evidence also suggested that Mr. Kuralt intended to do the same with the remaining 90 acres of his Madison County property.**

**¶23. The District Court, having allowed the introduction of extrinsic evidence on testamentary intent, erred in granting summary judgment because that evidence raised a genuine issue of material fact which precludes the granting of judgment as a matter of law. Our role in applying the criteria of Rule 56(c), M.R.Civ.P., like that of the District Court, is to first determine whether the Estate, as the moving party, has met its burden of demonstrating that no genuine issues of material fact exist which would preclude judgment as a matter of law. Here, the Estate has failed to sustain that burden and, accordingly, the court erred in granting summary judgment.**

**¶24. We disagree with the Estate's position that Shannon's extrinsic evidence is "immaterial" to the question of testamentary intent, and is merely "an insubstantial attempt to manufacture a material issue of fact." Rather, we agree with Shannon that the District Court improperly resolved contested issues of material fact when it**

found, in support of its conclusion that the letter "clearly contemplates a separate testamentary instrument not yet in existence," that:

The extrinsic evidence--none of which is contested--confirms this conclusion. Petitioner herself testified during her deposition and at trial that decedent intended to "sell"--not "will"--the Montana property to her in the fall of 1998. While the extrinsic evidence substantiates a close and personal relationship between Petitioner and the decedent extending over 29 years, during which she and her children were apparently entirely housed, supported, educated and temporarily set up in business by the decedent, those facts are not sufficient to create a testamentary intent which the language of the letter clearly refutes.

¶25. When drawing all reasonable inferences in favor of Shannon, as the party opposing summary judgment, we conclude that the extrinsic evidence raises a genuine issue of material fact as to whether Mr. Kuralt intended to gift, rather than sell, the remaining 90 acres of his Madison County property to Shannon. The plain language of the letter of June 18, 1997, indicates, as Shannon points out, that Mr. Kuralt desired that Shannon "inherit" all of his property along the Big Hole River. While other language in the letter--"I'll have the lawyer visit the hospital . . . if it comes to that"--might suggest, as the Estate argues and as the District Court concluded, that Mr. Kuralt was contemplating a separate testamentary instrument not yet in existence, it is far from certain that that is the result Mr. Kuralt intended by the letter.

¶26. At the very least, when reading the language of Mr. Kuralt's letter in light of the extrinsic evidence showing the couple's future plans to consummate the transfer of the remaining 90 acres vis-à-vis a mock "sale," there arises a question of material fact as to whether Mr. Kuralt intended, given his state of serious illness, that the very letter of June 18, 1997, effect a posthumous disposition of his 90 acres in Madison County. Nor are the parties merely arguing different interpretations of the facts here; we have, in this case, a fundamental disagreement as to a genuine material fact which would be better reconciled by trial.

¶27. As this Court has firmly acknowledged, summary judgment "was not intended nor can it be used as a substitute for existing methods in the trial of issues of fact . . . ." Kober v. Stewart (1966), 148 Mont. 117, 122, 417 P.2d 476, 479; *see also* Buskirk v. Nelson (1989), 237 Mont. 455, 460, 774 P.2d 398, 401; Hull v. D. Irvin

Transport Ltd. (1984), 213 Mont. 75, 81, 690 P.2d 414, 417. The very purpose of summary judgment is to determine whether any genuine issues of material fact exist. *See* Rule 56(c), M.R.Civ.P. However, it is not the function of a trial court to adjudicate genuine factual issues by way of summary judgment. In this case, the District Court improperly resolved a disputed issue of material fact on a summary judgment motion when it should have instead deferred the determination of that issue to the trier of fact at trial.

¶28. We hold that, because there is a genuine issue of material fact, the District Court erred in granting judgment as a matter of law. Accordingly, we reverse the court's grant of summary judgment and remand, for trial, the factual question of whether, in light of the extrinsic evidence, Mr. Kuralt intended the letter of June 18, 1997, to effect a testamentary disposition of the 90 acres in Madison County to Shannon.

¶29. Our holding obviates the need for this Court to reach the second issue on appeal. We note, however, that the parties spend a good deal of energy arguing, with respect to the second issue on appeal, whether extrinsic evidence on testamentary intent may be considered in any will dispute or only in those cases in which the alleged testamentary document is ambiguous as to intent. While we do not express any opinion with respect to the second issue on appeal, as we do not reach that issue herein, we deem it necessary, for purposes of guiding these proceedings on remand, to address the evidentiary question of whether a court may admit extrinsic evidence only when the alleged testamentary document is ambiguous as to intent.

¶30. In arguing to the District Court that extrinsic evidence may be admitted regardless of ambiguity, Shannon relied principally upon § 72-2-522, MCA, which states in relevant part: "Intent that the document constitute the testator's will may be established by extrinsic evidence, including, for holographic wills, portions of the document that are not in the testator's handwriting." Section 72-2-522(3), MCA (emphasis added). The language of that statute does not admit of any exception or qualification, but clearly permits a court to discretionarily admit extrinsic evidence bearing on testamentary intent in any will dispute. As a practical matter, a court will generally turn to extrinsic evidence when the alleged testamentary document is ambiguous as to intent; however, a court "may" admit extrinsic evidence in any will dispute where that evidence is helpful in ascertaining testamentary intent or lack thereof. *See* § 28-2-905(2), (3), MCA ("This section does not exclude other evidence of the circumstances under which the agreement," including a will, "was made or to

which it relates, as described in 1-4-102 . . . ."); § 1-4-102, MCA ("For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument and of the parties to it, may also be shown so that the judge be placed in the position of those whose language he [or she] is to interpret.").[(3)]

¶31. Nor is the language of § 72-2-522(3), MCA, inconsistent with our prior case law. It

has long been the general rule in this jurisdiction that:

"All that is necessary to make an instrument testamentary is that it should show, when read in connection with surrounding facts and circumstances, a testamentary intention." If the paper propounded is clearly of a testamentary character, it speaks for itself; but, if the intention of the testator is left in doubt by the form of expression used, then the intention must be arrived at by considering it in the light of the surrounding circumstances, and the intention must clearly appear.

In re Noyes' Estate (1909), 40 Mont. 231, 240-41, 106 P. 355, 358 (citations omitted). More recently, this Court has restated this general rule as follows: "Whether sufficient testamentary intent is present in an alleged will should be determined by first looking to the writing itself. However, if the intent is not clear from the writing, then the surrounding circumstances may be considered." Matter of Estate of Ramirez (1994), 264 Mont. 33, 36, 869 P.2d 263, 265 (citations omitted).

¶32. We do not disagree with the Estate's position that "[e]xtrinsic evidence is not admissible to supply testamentary intent when such intent is clearly absent on the face of the writing." Consistent with the Estate's position, the aforementioned authorities suggest that " 'the determination of the testamentary intent is to be made from the writing itself,' " and " 'the surrounding circumstances may be considered' " in making the determination whether an alleged testamentary document itself contains the requisite *animus testandi*. In re Van Voast's Estate (1953), 127 Mont. 450, 452, 266 P.2d 377, 378, *quoting* In re Augustad's Estate (1940), 111 Mont. 138, 140, 106 P.2d 1087, 1088. Under no circumstance, however, may extrinsic evidence be utilized to manufacture testamentary intent where the alleged testamentary document contains no indication of an intent by the testator to make a disposition of

property effective on death.

¶33. We are of the opinion, however, that Mr. Kuralt's letter of June 18, 1997, does not reveal a clear lack of testamentary intent. The letter suggests, as previously noted, that Mr. Kuralt desired Shannon to "inherit" the remainder of his property along the Big Hole River. Of course, as the parties dispute, other language in the letter raises the question of whether that expression of Mr. Kuralt's desire embodies merely an intent to perform an act in the future (i.e., prospective intent to draft a formal codicil to his Last Will), rather than a present, testamentary intent to dispose of his property (i.e., intent that the very letter constitute a valid holographic codicil to his Last Will).

¶34. However, when viewed in light of the extrinsic evidence, which shows not only the history of gift-giving by Mr. Kuralt to Shannon and her children but also that Mr. Kuralt wrote the letter in dispute under circumstances of dire health, the question of whether that letter contains the necessary *animus testandi* becomes an issue suitable for resolution by the trier of fact. Because Mr. Kuralt's letter is unclear as to testamentary intent, the District Court properly admitted extrinsic evidence bearing upon Mr. Kuralt's intent in the summary judgment proceeding. The court should, therefore, also admit all extrinsic evidence relevant to the question of Mr. Kuralt's testamentary intent when the issue goes to trial.

¶35. In sum, we reverse the District Court's grant of summary judgment to the Estate because there are genuine issues of material fact which preclude judgment as a matter of law. Accordingly, we remand for trial the question of whether Mr. Kuralt's June 18, 1997, letter evinces testamentary intent. In resolving that question at trial, the District Court shall admit, for the benefit of the trier of fact, extrinsic evidence germane to the question of testamentary intent.

¶36. Reversed and remanded.

/S/ W. WILLIAM LEAPHART

We concur:


/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

/S/ JAMES C. NELSON


Chief Justice J. A. Turnage dissenting.

¶37 I respectfully dissent and would affirm the District Court holding that the June 18, 1997 letter "clearly contemplates a separate testamentary instrument not yet in existence to accomplish the transfer of the Montana property."

¶38 Section 72-2-523, MCA, requires that a document or writing added upon a document can only constitute a decedent's will if the proponent establishes by clear and convincing evidence that the decedent intended the document or writing to constitute, in this case, decedent's holographic codicil.

¶39 The letter of June 18, 1997, and the record in this case does not meet the standard of clear and convincing evidence.

¶40 The June 18, 1997 letter, as set forth in the majority opinion, contains this--and only this--language relating to the question of a holographic will: "I'll have the lawyer visit the hospital to be sure you inherit the rest of the place in MT. if it comes to that." That language clearly indicates that decedent Kuralt did not intend the letter to operate as a holographic will but, rather, expressed his intent that at a future date he would have a lawyer visit him in the hospital to be sure that Patricia Shannon would, by a document thereafter to be executed, inherit "the rest of the place in MT." Such language is precatory and expresses only a desire or wish. It certainly does not constitute imperative, direct terms of bequest.


/S/ J. A. TURNAGE

1. **1** It is undisputed in this case that Mr. Kuralt's letter of June 18, 1997, meets the threshold formal requirements for a valid holographic will: Mr. Kuralt was of sound mind and sufficient age at the time that he wrote the letter, and the letter is entirely in Mr. Kuralt's handwriting and was signed by him. *See* §§ 72-2-521 and -522(2), MCA. Thus, the only issue in dispute here is the question of whether Mr. Kuralt possessed the requisite testamentary intent in writing the letter.

2. **2** The District Court denied the Estate's request for summary judgment with respect to certain items of personal property, about which the court held that there were contested issues of material fact. This aspect of the District Court's summary judgment ruling is not at issue on appeal.

3. **3** As the District Court itself noted in its summary judgment order:

Generally, however, in giving effect to any will, some extrinsic evidence must be admitted to enable the court to apply the words of the will to the matters to which it relates. "This is true even though there is no ambiguity in the will, for what the courts mean when they say that extrinsic evidence is not admissible when the will contains no ambiguity is that such evidence will not be admitted to vary or contradict the unambiguous language of the will."